ORAL ARGUMENT NOT YET SCHEDULED

No. 11-1428
(Consolidated with Nos. 11-1441 and 12-1427)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

DELTA CONSTRUCTION COMPANY, INC., et al.,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

Respondents.

On Appeal from the U.S. Environmental Protection Agency
and the U.S. Department of Transportation
76 F.R. 57106, 77 F.R. 51499, and 77 F.R. 51701

**CORRECTED JOINT OPENING BRIEF OF PETITIONERS
DELTA CONSTRUCTION COMPANY, INC., ET AL., AND
PLANT OIL POWERED DIESEL FUEL SYSTEMS, INC.**

CLAUDE D. CONVISSER
  D.C. Circuit Bar No. 47851
  Plant Oil Powered
  Diesel Fuel Systems, Inc.
  P.O. Box 6397
  Santa Fe, New Mexico 87502
  Telephone: (505) 310-3840
  Facsimile: (866) 239-7527
  E-mail: cdc@popdiesel.com
Counsel for Petitioner Plant Oil
Powered Diesel Fuel Systems, Inc.

M. REED HOPPER
  D.C. Circuit Bar No. 44739
THEODORE HADZI-ANTICH
  D.C. Circuit Bar No. 53056
  Pacific Legal Foundation
  930 G Street
  Sacramento, California 95814
  Telephone: (916) 419-7111
  Facsimile: (916) 419-7747
  E-mail: mrh@pacificlegal.org
  E-mail: tha@pacificlegal.org
Counsel for Petitioners Delta
Construction Company, Inc., et al.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioners state as follows:

The Court's Order of February 4, 2014, Doc. No. 1478223, requires the remaining petitioners in this case, who have separate interests that are not aligned, to file joint briefs subject to a combined word limit. Three cases have been consolidated by the court for purposes of the instant briefing. The cases challenge a nationally applicable joint rulemaking of the United States Environmental Protection Agency ("EPA") and the United States Department of Transportation ("DOT"), published at 76 Fed. Reg. 57,106 (Sept. 15, 2011), entitled, "*Greenhouse Gas Emissions Standards and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles*" (the "Truck Rule").

**(A)** **Parties and *Amici***

**<u>PETITIONERS</u>**

**Case No. 11-1428:** Delta Construction Company, Inc.; Dalton Trucking, Inc.; Southern California Contractors Association; California Dump Truck Owners Association (now California Construction Trucking Association, Inc.) (Collectively, the "California Petitioners").

**Case Nos. 11-1441 and 12-1427:** Plant Oil Powered Diesel Fuel Systems, Inc. ("POP Diesel").

**RESPONDENTS**

**Case No. 11-1428:** EPA.

**Case Nos. 11-1441 and 12-1427**: EPA and DOT.

**PROPOSED RESPONDENTS-INTERVENORS**

**Case No. 11-1428:** The Court's Order dated March 28, 2012, deferred ruling on motions for intervention until the merits stage. Doc. 1366117. On December 14, 2011, a joint Motion to Intervene on behalf of the Respondents was filed by The States of California, Illinois, Iowa, Maryland, Massachusetts, New York, Oregon, Vermont, and Washington, as well as the City of New York (the "Government Movants"). Doc. 1347690. A separate joint Motion to Intervene on behalf of Respondents was filed the same day by Natural Resources Defense Council, Environmental Defense Fund, and Sierra Club (the "Environmental Group Movants"). Doc. 1347694. The California Petitioners filed a consolidated opposition to both motions on December 29, 2011. Doc. 1350211. Environmental Group Movants filed their reply on January 6, 2012, Doc. 1351567, while the Government Movants filed their reply on January 9, 2012, Doc. 1351658.

***AMICI***

**Case No. 11-1428:** There are no amici at this time.

**(B)    Rulings Under Review**

These petitions for review challenge the nationally applicable Truck Rule, 76 Fed. Reg. 57,106 (Sept. 15, 2011).

POP Diesel served an identical petition for reconsideration of the GHG Emissions Standards and the Fuel Efficiency Standards on both EPA and DOT.  EPA denied POP Diesel's petition.  77 F.R. 51701 (Aug. 27, 2012).  DOT did not issue its own ruling on POP Diesel's petition.  The National Highway Transportation Safety Administration, a constituent part of DOT, which incorrectly[1] claimed to have issued the Fuel Efficiency Standards, considered POP Diesel's petition to DOT as a petition for rulemaking, rather than as a petition to reconsider the Truck Rule, and denied it. 77 F.R. 51499 (Aug. 24, 2012).

---

[1] DOT's Secretary, Ray LaHood, rather than the National Highway Transportation Safety Administration's Administrator, signed the Truck Rule.  POP Diesel's Addendum ("ADD"), 133.  The National Highway Transportation Safety Administration did not have a delegation from DOT or any other legal authority to engage in such rulemaking. According to 49 C.F.R. § 1.95(j)(3), The National Highway Transportation Safety Administration's delegated authority is limited to conducting the fuel efficiency study for trucks that is mandated by 49 U.S.C. § 32902(k)(1) and it does not include DOT's rulemaking mandated by 49 U.S.C. § 32902(k)(2).  A separate delegation from DOT to the National Highway Transportation Safety Administration, appearing at 49 C.F.R. § 1.50(q), does not include Section 102 of EISA, which is the Section of EISA that mandated the fuel efficiency study and rulemaking for trucks.  *See* Public Law 110-140, Energy Independence and Security Act of 2007, § 102, 121 Stat. 1492, 1498 (Dec. 19, 2007) (codified at 49 U.S.C. § 32902(k)).  ADD, 1.

**(C)    Related Cases**

**Case Nos. 11-1438 and 11-1440:**  On February 4, 2013, those two cases were severed from the instant cases and consolidated with each other pending resolution by the United States Supreme Court of *Utility Air Regulatory Group v. EPA*, Nos. 12-1146, *et al.*, *cert granted*, 134 S. Ct. 418 (Oct. 15, 2013).  Doc. 1478250.

**Case No. 13-1076**:  On February 4, 2013, the Court ordered that the California Petitioners' separate challenge to the joint EPA/DOT rule governing greenhouse gas emissions from light duty vehicles (the "Car Rule") be coordinated with the instant case, such that briefing of the Truck Rule challenge and the Car Rule challenge will occur on the same schedule, and oral argument in the two cases will be scheduled on the same day before the same panel.  Doc. 1478250.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, and Circuit Rule 26.1, the respective Petitioners provide the following disclosures:

**Case No. 11-1428**

Delta Construction Company, Inc., is a California corporation that provides road construction services.  Delta Construction Company, Inc., has no parent company, and no publically held company has a 10% or greater ownership interest in it.

Dalton Trucking, Inc., is a California corporation that provides specialized transportation and off-loading services.  Dalton Trucking, Inc., has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

Southern California Contractors Association, Inc., is a non-profit trade organization that represents and promotes the interest of union contractors and their suppliers.  The Southern California Contractors Association, Inc., has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

The California Construction Trucking Association (formerly California Dump Truck Owners Association), is a trade association representing the interests of small and large trucking companies in California.  The California Construction Trucking

Association, has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

**Case Nos. 11-1441 and 12-1427**

Plant Oil Powered Diesel Fuel Systems, Inc. (POP Diesel) is a Delaware corporation with headquarters in New Mexico that manufactures engine equipment and biofuel. POP Diesel does not have a parent company, and there is not any publically held company has a 10 percent or greater ownership interest in it.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES. . . . . . .  i

CORPORATE DISCLOSURE STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . v

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

GLOSSARY OF ABBREVIATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xix

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Case Nos. 11-1441 and 12-1427. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Case No. 11-1428. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Case Nos. 11-1441 and 12-1427. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Case No. 11-1428. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATUTES AND REGULATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF THE CASE AND FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . 5

Case Nos. 11-1441 AND 12-1427. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

  Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

  Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

  1. Fossil Fuel Combustion and Use is the Cause of the
     Harm of Greenhouse Gas-Induced Global Warming. . . . . . . . . . . . . . . . 6

  2. The Tailpipe Rule Creates Incentives That
     Contradict Lowering Greenhouse Gas Emissions. . . . . . . . . . . . . . . . . . 9

Page

    a.  POP Diesel's Comments to the Administrative Record............ 10

    b.  Electricity to Power Engines................................... 11

    c.  Hydrogen to Power Engines................................... 13

    d.  Fossil Fuel Natural Gas to Power Engines...................... 14

    e.  Biofuels to Power Engines.................................... 14

3.  The Only Precise Quantitative Analysis of the Truck
Rule's Rebound Effect and Its Indirect Rebound Component
Leads to the Conclusion That the Tailpipe Rule is
Counter-productive to the Goals of Reducing Total
Overall Energy Consumption and GHG Emissions. .................. 15

    a.  The Agencies' Uncertainty Over
the Magnitude of the Rebound Effect........................... 16

    b.  POP Diesel's Comments
to the Administrative Record. ................................. 16

    c.  Dr. Harry Saunders's Quantified Analysis
of the Truck Rule's Rebound Effect............................ 17

        i.  Embedded Energy Indirect Rebound Effect . .................. 18

        ii.  Rebound Backfire from Embedded
Energy Indirect Rebound Effect............................ 19

4.  POP Diesel Had Good Reason for Not Submitting
Some Material Evidence to the Two Agencies Until
After Publication of the Truck Rule............................... 21

Case No. 11-1428. .................................................. 24

SUMMARY OF ARGUMENT....................................... 25

Page

Case Nos. 11-1441 and 12-1427. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Case No. 11-1428. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

STANDING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Case Nos. 11-1441 and 12-1427. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Case No. 11-1428 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Case No.'s 11-1441 and 12-1427. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

I.    IT WAS INCONSISTENT WITH LAW FOR EPA
      AND DOT TO DENY THE MATERIALITY AND
      CENTRAL RELEVANCE OF DIESEL'S POST-RULE PUBLICATION
      SUBMISSIONS, WHICH POP DIESEL
      COULD NOT SUBMIT EARLIER, AND POP DIESEL'S ADDITIONAL
      SUBMISSIONS NOW COMPEL A
      REMAND TO THE TWO AGENCIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

      A. POP Diesel's Additional Submissions Were and
         Are Material and Centrally Relevant to the Truck Rule. . . . . . . . . . . . . 34

         1. Dr. Saunders's Analysis of the Rebound Effect. . . . . . . . . . . . . . . . 35

         2. The Technological Feasibility of POP Diesel's Enabling
            Engine Equipment and 100 Percent Jatropha Oil Fuel as
            Illustrating the Need to Rank of Engine-enabled Fuels
            According to Their Lifecycle GHG Emissions . . . . . . . . . . . . . . . . 37

      B. It Was Evident from the Face of the Documents
         That POP Diesel Could Not Make its Key Submissions
         During the Rulemaking Because They Did Not Exist Then. . . . . . . . . . 38

- ix -

Page

    C.  EPA's Ignoring its Legal Duty to Commence
        a Reconsideration Proceeding Compels a Remand. . . . . . . . . . . . . . . 38

    D.  This Is an Appropriate Case for the
        Court to Remand and Vacate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

II.  THE TRUCK RULE IS ARBITRARY AND
    CAPRICIOUS BECAUSE IT MEASURES FUEL
    EFFICIENCY AND GHG EMISSIONS SOLELY
    BY TAILPIPE CARBON EMISSIONS, RATHER
    THAN BY THE ENGINE-ENABLED FUEL'S
    LIFECYCLE GHG EMISSIONS... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

III.  THE TRUCK RULE'S INCORPORATION BY
    REFERENCE OF THE RENEWABLE FUEL
    STANDARD FAILS IN THE CASE OF POP
    DIESEL'S 100 PERCENT JATROPHA PLANT OIL FUEL... . . . . . . . . . . 46

IV.  THE TRUCK RULE IS INCONSISTENT WITH
    LAW SINCE THE ONLY EVIDENCE PRECISELY
    QUANTIFYING THE MAGNITUDE OF ITS FUEL
    EFFICIENCY REBOUND EFFECT, CONCERNING
    ITS EMBEDDED ENERGY INDIRECT COMPONENT
    THAT DOT AND EPA NEVER CONSIDERED, IS
    THAT THIS RULE WILL INCREASE BOTH TOTAL
    OVERALL ENERGY CONSUMPTION AND
    CONSEQUENT GHG EMISSIONS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Case No. 11-1428. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

I   THE MOTIONS TO INTERVENE IN
    CASE NO. 11-1428 SHOULD BE DENIED. . . . . . . . . . . . . . . . . . . . . . . . 53

II.  EPA VIOLATED A STATUTORY MANDATE
    WHEN IT FAILED TO SUBMIT THE TRUCK
    RULE TO THE SCIENCE ADVISORY BOARD
    FOR PEER REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

**Page**

A. Argument One:  EPA Violated a Nondiscretionary
   Statutory Mandate.............................................. 56

   1. The Plain Language of the SAB Statute Required
      EPA to Submit the Truck Rule to the Science Advisory
      Board for Peer Review..................................... 56

      a. The Truck Rule Is Both a "Standard"
         and a "Regulation"................................... 58

      b. EPA Provided the Truck Rule to "Other"
         Federal Agencies for Formal Review and
         Comment Before It Was Promulgated.................... 59

      c. The Truck Rule Was Never "Made Available"
         to the Science Advisory Board for Peer Review........ 62

   2. The Science Advisory Board Peer Review
      Mandate Is Not Subject to the Judicial Review
      Constraints on EPA's Violations of Clean Air Act
      Procedural Requirements................................... 64

   3. EPA's Failure to Submit the Regulation to
      the Science Advisory Board Was Not Harmless.............. 68

B. In the Alternative, Argument Two:  EPA's Failure To
   Submit the Truck Rule to the Science Advisory Board
   Was So Serious and Related to Matters of Such Central Relevance That
   There Is a Substantial Likelihood the
   Rule Would Have Been Significantly Changed by EPA
   If Peer Review Had Been Sought.............................. 70

C. The Decision in *Coalition for Responsible
   Regulation, et al., v. Environmental Protection Agency* Regarding the
   Endangerment Finding Does Not Constrain
   this Court from Ruling in Favor of the Petitioners in Connection with this
   Challenge to the Truck Rule................................. 75

**Page**

III   THE TRUCK RULE SHOULD BE
      REMANDED AND VACATED.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  80

CERTIFICATE OF COMPLIANCE WITH RULE 32(a). . . . . . . . . . . . . . . . . .  81

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  82

POP DIESEL'S SUPPLEMENTAL ADDENDUM
      REGARDING STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83

ADDENDUM OF PETITIONERS
DELTA CONSTRUCTION COMPANY, INC., ET AL.

POP DIESEL'S SUPPLEMENTAL APPENDIX, VOLUME 1 (PUBLIC
APPENDIX)

POP DIESEL'S ADDENDUM, VOLUME 1 (PUBLIC ADDENDUM)

POP DIESEL'S SUPPLEMENTAL APPENDIX AND ADDENDUM, VOLUME
2 (UNDER SEAL)

# TABLE OF AUTHORITIES

Page

## Cases

*Ala. Mun. Distributors Group v. F.E.R.C.*,
   300 F.3d 877 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Am. Petroleum Inst. v. Costle*,
   665 F.2d 1176 (D.C. Cir. 1981). . . . . . . . . . . . . 53, 55, 59, 60, 62-63, 65, 68, 74

*Amalgamated Transit Union Int'l, AFL-CIO v. Donavan*,
   771 F.2d 1551 (D.C. Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Americans for Safe Access v. Drug Enforcement
   Administration*, 706 F.3d 438 (D.C. Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . 31

*Appalachian Power Co. v. EPA*, 251 F.3d 1026 (D.C. Cir. 2001). . . . . . . . . . . . . 71

*Arkema, Inc. v. EPA*, 618 F.3d 1 (D.C. Cir. 2010). . . . . . . . . . . . . . . . . 29, 36, 51

*Bennett v. Spear*, 520 U.S. 154 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . 29, 54, 60

*Catawba County, N.C. v. EPA*, 571 F.3d 20 (D.C. Cir. 2009). . . . . . . . . . . . . 29, 47

*Cement Kiln Recycling Coalition v. EPA*,
   255 F.3d 855 (D.C. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Center for Auto Safety v. Peck*, 751 F.2d 1336 (1985). . . . . . . . . . . . . . . . . . 38, 39

*Chevron v. Natural Resources Defense Council*,
   467 U.S. 837 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Chevron, U.S.A., Inc. v. NRDC*,
   467 U.S. 837 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 52, 54-55, 60, 68

Authorities upon which we chiefly rely are marked with asterisks.

**Page**

*Coalition for Responsible Regulation v. EPA*,
  684 F.3d 102 (D.C. Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 72-74

*Coalition for Responsible Regulation v. EPA*,
  684 F.3d 102 (D.C. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 33, 41

*Cooper Industries, Inc. v. Aviall Services, Inc.*,
  543 U.S. 157 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Ctr. For Energy & Econ. Dev. v. EPA*,
  398 F.3d 653 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*ETSI Pipeline Project v. Missouri*, 484 U.S. 495 (1988). . . . . . . . . . . . . . . . . . . 60

*Federal Power Commission v. Transcontinental
  Gas Pipe Line Corp.*, 423 U.S. 326 (1976).. . . . . . . . . . . . . . . . . . . . . . . . 75

*Food and Drug Admin. v. Brown & Williamson*,
  529 U.S. 120 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Illinois Bell Tel. Co. v. FCC*, 911 F.2d 776 (D.C. Cir 1990). . . . . . . . . . . . . . . . 51

*Int'l Fabricare Instit. v. EPA*, 972 F.2d 384 (D.C. Cir. 1992). . . . . . . . . . . 29, 51

*Kennecott Corp. v. EPA*, 684 F.2d 1007 (D.C. Cir. 1982). . . . . . . . . . . . . 69, 71

*Lopez v. Davis,* 531 U.S. 230 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Massachusetts v. EPA*, 549 U.S. 497 (2007). . . . . . . . . . . . . . . . . . . . . . . . 41, 47

*Meyerhoff v. United States EPA*, 958 F.2d 1498 (9th Cir. 1992). . . . . . . . . . . . . . 55

*Moskal v. United States*, 498 U.S. 103 (1990). . . . . . . . . . . . . . . . . . . . . . . . 54, 70

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
  551 U.S. 644 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Page

*Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518 (1986). . . . . . 61-63, 74

*Sierra Club v. EPA,* 705 F.3d 458 (D.C. Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . 35

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . 30

*Small Refiner Lead Phase-Down Task Force v. EPA*,
 705 F.2d 506 (D.C. Cir 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61-62, 65

*Sprint Corp. v. Fed. Commc'n Comm'n*, 315 F.3d 369 (D.C. Cir. 2003). . . . . . . 75

*Sugar Cane Growers Co-op of Florida v. Veneman*,
 289 F.3d 89 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Tex Tin Corp. v. EPA*, 935 F.2d 1321 (D.C. Cir. 1991). . . . . . . . . . . . . . . . . . . . 72

*Thomas v. New York*, 802 F.2d 1443 (D.C. Cir. 1986),
 cert. denied, 482 U.S. 919 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*U.S. v. Kirby*, 74 U.S. 482 (1868). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 72

**Federal Statutes**

Public Law 110-140, Energy Independence and Security Act of 2007,

§ 102, 121 Stat. 1492, 1498 (Dec. 19, 2007)

(codified at 49 U.S.C. § 32902(k)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

5 U.S.C. § 551(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

§ 702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

§ 706. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 29

15 U.S.C. § 1913(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**Page**

42 U.S.C. § 32902(k)(1)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 46

§ 4321. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

§ 4365(c)(1). . . . . . . . . . . . . . . . . . . . . 5, 24, 28, 54, 56, 58, 61-62, 67, 73

§ 4365(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53-55, 70

§ 7521. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

§ 7521(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 55, 56

§ 7521(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

§ 7545(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 45

§ 7545(o). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

§ 7607(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

§ 7607(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 34

§ 7607(d)(4)(B)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

§ 7607(d)(7)(B). . . . . . . . . . . . . . . . . . . . . . 1, 25, 32-33, 35-37, 72

§ 7607(d)(8). . . . . . . . . . . . . . . . . . . . . . . . . 5, 25, 28, 61, 68, 71, 74

§ 7607(d)(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 39, 41

49 U.S.C. § 32503(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

§ 32902(k). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

§ 32902(k)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

§ 32902(k)(1)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 35, 39, 47-48

**Page**

§ 32902(k)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 32, 45

§ 32909(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

§ 32909(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

§ 32909(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 4, 5, 9, 18, 25, 35, 37

§ 32909(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

§ 32909(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 32

## Federal Regulations

40 C.F.R. § 1.25(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

§ 80.1401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 44

§ 1036.108. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

§ 1400. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

76 F.R. 74854, 75010 (Dec. 1, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

77 F.R. 51701, 51702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 36

58 Fed. Reg. 51,735 (Sept. 30, 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

76 Fed. Reg. 57,106 (Sept. 15, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## Rules of Court

D.C. Cir. Rule 27(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 51

Rule 28(a)(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Fed. R. App. P. 15(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 50, 52

**Page**

Fed. R. App. P. 26(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 51

**Miscellaneous**

Conley, Joe G., *Conflict of Interest and the EPA's
Science Advisory Board*, 86 Tex. L. Rev. 165 (2007). . . . . . . . . . . . . . . . . . . 54

Dwyer, Lynne E., *Good Science in the Public Interest:
A Neutral Source or Friendly Facts?* 71 Hastings College
of Law West - Northwest Journal of Environmental
Law & Policy, 3 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70-71

Executive Order 12866. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57-58, 73

§ 3(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

§ 4(c)(1) (A) - (F). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

§ 4(c)(3) - (7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

H. Rep. 95-294 (May 12, 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 72

H.R. Conf. Rep. 96-722 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 68

Singer, Norman J., *2A Sutherland Statutes and Statutory
Construction* § 48:6 (7th ed. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

# GLOSSARY OF ABBREVIATIONS

American Petroleum Institute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . API

California Construction Trucking Association, Inc.. . . . . . . . . . . . . . . . . . . .   CCTA

Clean Air Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . CAA

Greenhouse Gas. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   GHG

Office of Management and Budget. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . OMB

Petitioner Plant Oil Powered Diesel Fuel Systems, Inc.. . . . . . . . . . . . .  POP Diesel

Science Advisory Board. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SAB

U.S. Department of Transportation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOT

U.S. Environmental Protection Agency. . . . . . . . . . . . . . . . . . . . . . . . . . . . . EPA

# JURISDICTIONAL STATEMENT

## Case Nos. 11-1441 and 12-1427

EPA promulgated the Truck Rule under the Clean Air Act ("CAA"), 42 U.S.C. § 7521(a)(1). DOT promulgated the Truck Rule under the Energy Independence and Security Act of 2007, 49 U.S.C. § 32902(k)(2).

This Court has exclusive, original jurisdiction to review any standard, including the GHG Emissions Standards, adopted under 42 U.S.C. § 7521. 42 U.S.C. § 7607(b)(1). This Court has express, original jurisdiction to review "a regulation prescribed in carrying out any of sections 32901-32904 or 32908 of [Title 49]," such as the Fuel Efficiency Standards. 49 U.S.C. § 32909(a)(1). Title 49 U.S.C. § 32909(c) confers jurisdiction on this Court to consider POP Diesel's additional, material submissions made to this Court pertaining to the Fuel Efficiency Standards. 49 U.S.C. § 32909(c). This Court has exclusive jurisdiction to review EPA's denial of POP Diesel's petition for reconsideration. 42 U.S.C. § 7607(d)(7)(B) (referring to § 7607(b)).

POP Diesel timely filed a petition for review of the Truck Rule, Case No. 11-1441, on Monday, November 14, 2011, 59 days after its publication in the Federal Register on September 15, 2011. 42 U.S.C. § 7607(b)(1) (petition for review of CAA regulations must be filed within 60 days of their publication); 49 U.S.C. § 32909(b) (petition for review of fuel efficiency regulations "must be filed not later than 59 days

after the regulation is prescribed").

POP Diesel also served by hand delivery a petition for reconsideration of the Truck Rule on both EPA and DOT on Monday, November 14, 2011. <u>See</u> Cert. of service, petition for review in Case No. 11-1441, Doc. 1341785 (stating service of petition for reconsideration by hand delivery on both agencies on that date).

POP Diesel served on DOT and EPA on February 13, 2012 by express, overnight delivery an amended and supplemental petition for reconsideration, which included six new exhibits. The National Highway Transportation Safety Administration and EPA denied POP Diesel's petitions. ADD, 20 (NHTSA); ADD, 25 (EPA). Treating The National Highway Transportation Safety Administration's denial as a denial by DOT, POP Diesel filed a petition seeking review of DOT's and EPA's denials on October 23, 2012 and filed a corrected petition for review on November 13, 2012.

This appeal is from final orders that dispose of all petitioners' claims, with the exception of POP Diesel's renewing its request under 49 U.S.C. § 32909(c) to remand the record to DOT and EPA, which this Court's order of May 1, 2013 referred to the merits panel. Doc.1433790.

- 2 -

**Case No. 11-1428**

California Petitioners seek review of the nationally applicable final Truck Rule published at 76 Fed. Reg. 57,106 (Sept. 15, 2011).  The California Petitioners filed their Petition for Review within the requisite 60-day period under Clean Air Act ("CAA") § 307(b)(1), 42 U.S.C. § 7607(b)(1), and this Court has jurisdiction under that provision, as well as under 5 U.S.C. § 702, 706.

**STATEMENT OF ISSUES[2]**

**Case Nos. 11-1441 and 12-1427**

1.    Whether DOT and EPA breached their legal duties in denying POP Diesel's petition and amended  and supplemental petition for reconsideration, when POP Diesel's additional submissions and objections served on the two agencies were material and of central relevance to the Truck Rule and POP Diesel had good cause for not submitting them during the rulemaking, and whether POP Diesel's additional submissions made herewith under authority of 49 U.S.C. § 32909(c) now also compel

---

[2] This Court's Order of February 4, 2014, Doc. No. 1478223, directed the petitioners in these consolidated cases to file a joint opening brief subject to a combined word limit.  However, their interests are not aligned.  Therefore, the petitioners have drafted and edited their respective, separately designated portions of the brief independently of each other.  Accordingly, the California Petitioners in Case No. 11-1428 do not join in those portions of this brief dealing with issues arising under Case Nos. 11-1441 and 11-1427, and the Petitioner POP Diesel in Case Nos. 11-1441 and 11-1427 does not join in those portions of this brief dealing with issues arising under Case No. 11-1428.  The Joint Petitioners have used best efforts to differentiate those portions of this joint brief that deal with each respective set of issues and arguments.

- 3 -

this Court to order a remand.

2.    Whether the Truck Rule is arbitrary and capricious because it measures fuel consumption and GHG emissions solely by motor vehicle tailpipe emissions, rather than by a comparison of the full lifecycle GHG emissions of the engine technology-enabled fuel.

3.    Whether the Truck Rule's incorporation by reference of the Renewable Fuel Standard as the sole means for taking into account 100 percent jatropha oil fuel and enabling diesel engine equipment was arbitrary and capricious or inconsistent with law, given that the Renewable Fuel Standard by definition excludes this new fuel.

4.    Whether the Truck Rule is inconsistent with law or as adopted by EPA, irrational, since the only evidence precisely quantifying the magnitude of its fuel efficiency rebound effect, including the embedded energy indirect rebound effect that DOT and EPA never considered, is that this Rule will increase both total overall energy consumption and consequent GHG emissions.

## Case No. 11-1428

1.    Whether the motions to intervene on behalf of Respondent should be denied because they were not timely filed.

2.    A.    Whether EPA's failure to submit the proposed Truck Rule to the Science Advisory Board for external peer review requires remand and vacatur under

the Science Advisory Board statute, 42 U.S.C. § 4365(c)(1), because the failure was a violation of a nondiscretionary statutory duty, or, in the alternative,

      B.    Whether EPA's failure requires remand and vacatur under a provision of the CAA, 42 U.S.C. § 7607(d)(8), because the failure was so serious and related to matters of such central relevance to the Truck Rule that there is a substantial likelihood that the rule would have been significantly changed if EPA had sought peer review from the Science Advisory Board.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are in the California Petitioners' Addendum, designated as Addendum of Petitioners Delta Construction Company, Inc., et al., at Appendix A, and in POP Diesel's separate Addendum, Volume 1.

## STATEMENT OF THE CASE AND FACTS

These consolidated cases challenge the joint Truck Rule. Each case raises distinct claims. The only common element is that the cases challenge the same rule.

### Case Nos. 11-1441 AND 12-1427

#### <u>Procedural History</u>

POP Diesel moved this Court in its Case No. 11-1441 to remand the record to DOT under 49 U.S.C. § 32909(c) to receive additional submissions that POP Diesel had reason to not submit during the rule-making. The Court denied this motion without prejudice to POP Diesel's ability to renew in this briefing POP Diesel's

arguments in support of a remand. Order dated May 1, 2013, Doc. 1433790.

DOT moved to dismiss the portion of POP Diesel's petition seeking review in Case No. 12-1427 of DOT's denial of POP Diesel's petition for administrative reconsideration of the Fuel Efficiency Standards on the grounds that this Court lacks jurisdiction. This Court referred this motion to the merits panel, subject to arguments made in the briefs. Order dated May 1, 2013, Doc. 1433790.

POP Diesel moved for an order that DOT designate in its certified index in Case No. 12-1427 the twelve exhibits that were attached to POP Diesel's petition for reconsideration, which exhibits EPA received and designated in its certified index, but DOT claims never to have received and did not designate in its certified index. The Court ordered (i) POP Diesel to submit a supplemental appendix herewith containing these twelve exhibits, which POP Diesel does herewith in Supplemental Appendix (Public Appendix), Volume 1, 19 - 223, and Volume 2 (Under Seal), 275-314, and (ii) the parties to raise this issue anew in briefing on the merits. Order dated Feb. 4, 2014, Doc. 1478223.

**Statement of Facts**

**1.     Fossil Fuel Combustion and Use Is the Cause of the Harm of Greenhouse Gas-Induced Global Warming**

Fossil fuels consist of coal, petroleum, and natural gas. U.S. Climate Change Science Program (ADD, 376). While greenhouse gas emissions in general endanger

- 6 -

human health and welfare by elevating global warming,[3] the specific cause of the harm is fossil fuel emissions. According to EPA, "fossil fuel combustion is the primary source contributing to $CO_2$ emissions." ADD, 381; ADD, 387. It accounts for almost 94 percent of total carbon dioxide emissions. EPA (ADD, 381). Transportation comprises one-third of fossil fuel emissions. Id.

When combusted, fossil fuels release carbon in the form of carbon dioxide that has been stored inside the earth for millenia. U.S. Climate Change Science Program, (ADD, 376). In contrast, the growth of plants from the earth sequesters carbon from the atmosphere by the process of photosynthesis. See id., at 195. It is a point of physics that the combustion of a particular plant's carbon matter can emit at most no more carbon than the plant has extracted from the atmosphere. The plant fuel's life cycle, considered in this simplified way, has net carbon emissions of zero, meaning that it does not contribute over its lifetime and afterlife combustion any net addition of carbon into the atmosphere. U.S. Dep't of Energy (ADD, 399). However, this formula does not take into account additional carbon emissions that humans cause by burning energy to grow, harvest and process plant matter into fuel.

The extraction from the earth and combustion of fossil fuels, rather than the combustion of renewable plant matter, is causing global warming. Fossil fuel coal

---

[3] *Coalition for Responsible Regulation v. EPA*, 684 F.3d 102 (D.C. 2012) (affirming EPA's endangerment finding).

is the energy source for 45 percent of the electricity generated in the United States, which powers plug-in electric vehicles. Amended and supplemental petition for reconsideration (ADD, 259, 268) (quoting U.S. Energy Information Administration). Fossil fuels petroleum and natural gas fuel medium- and heavy-duty engines. To the extent that federal GHG policy rewards fossil fuel combustion, directly or indirectly, this policy is contributing to the net accumulation of more GHG's in the atmosphere and the worsening of global warming, rather than its amelioration. See National Research Council, at 16 (EPA-HQ-OAR-2010-0162-3346) (Joint Appendix (J.A.), XXXX) (policy choices made today will have long-term impact).

The U.S. Patent & Trademark Office awarded POP Diesel a patent on its dual-tank fuel system that can enable any diesel engine to operate on 100 percent plant oil, like the vegetable oil you buy at the grocery store, in 2011. Amended and supplemental petition for reconsideration (ADD, 271). EPA[4] and the National Highway Transportation Safety Administration[5] gave official approval in July 2013 to the installation of POP Diesel's 100 percent plant oil enabling auxiliary fuel system

---

[4] EPA On-road Vehicles and Engines, Clean Alternative Fuel Conversion web page, Outside Useful Life database as of March 26, 2014 (POP Diesel's Supplemental Appendix, Volume 1 ("S.A. 1"), at 266, 273 (last page shows POP Diesel approval). POP Diesel submits this document, which is not included in the administrative record, under authority of 49 U.S.C. § 32909(c)(2) as part of its renewed request to this Court to remand the Truck Rule. Order dated May 1, 2013.

[5] EPA received the National Highway Transportation Safety Administration's approval before giving its own.

on select diesel engines and EPA approved POP Diesel's sale and use of 100 percent jatropha plant oil in these POP Diesel-equipped engines.  POP Diesel is prepared to introduce new heavy duty diesel engines to the market, equipped from the factory to run on this 100 percent jatropha plant oil fuel, beginning with a 13 liter engine suitable for use in a semi truck. ADD, 272; petition for reconsideration, S.A. 1, 3.

POP Diesel hereby submits to the Court under authority of 49 U.S.C. § 32909(c) additional information that it submitted to EPA in 2012 proffering that the theoretical, potential yield of jatropha oil in five countries where POP Diesel has relations with growers is 5.688 billion gallons per year.  POP Diesel's Supplemental Appendix and Addendum, Volume 2[6] ("S.A. 2"), 219.

## 2. The Tailpipe Rule Creates Incentives That Contradict Lowering Greenhouse Gas Emissions

The core of the Truck Rule's Fuel Efficiency and GHG Emissions Standards is the definition that both sets of Standards use for measuring "fuel" and GHG emissions.  GHG emissions are defined as the amount of carbon dioxide emitted from the motor vehicle's tailpipe, which the Truck Rule converts to a value for "fuel consumption" (together, "the Tailpipe Rule").  Final Rule, ADD, 47-50; 40 C.F.R.

---

[6] Please note that this Volume 2, as set forth in its Table of Contents, contains exclusively documents that are Under Seal (a) that are not yet admitted of record, its pages 275 to 327, or (b) that are referred to in POP Diesel's Addendum, Volume 1 (Public Addendum), and are already part of the administrative record, its pages 328 to its end.

1036.108 and 49 C.F.R. part 535 (ADD, 109 and 113, et seq.). This gives:

- electricity- and hydrogen-powered vehicles a 100 percent benefit under both sets of Standards, as their tailpipe emissions and therefore, "fuel consumption" defined under the Tailpipe Rule are zero;

- natural gas-powered engines a benefit of between 20 and 30 percent, based on lower tailpipe carbon emissions than petroleum fuel;

- biofuels covered by the Renewable Fuel Standard, a separate regulatory program administered by EPA, benefits thereunder; and

- POP Diesel's 100 percent jatropha plant oil fuel and enabled engines, no benefit at all.

### a.    POP Diesel's Comments to the Administrative Record

POP Diesel stated during the Truck Rule's public comment period: "The absence of consideration of the complete life cycle emissions of fuel in your analysis of alternatives is a fundamental omission, if the goal of your proposed regulations is actually to reduce net [GHG's]."  ADD, 246.  POP Diesel elaborated in its comments on "the complete life cycle emissions of a fuel" as follows:

> [A] vehicle or engine manufacturer should have to provide data to you on the complete life cycle emissions for any fuel that the manufacturer certifies its vehicle or engine to operate on.  The complete life cycle includes the cost of mining petroleum or coal; planting, fertilizing, and harvesting biological feedstock such as vegetable oil-

> bearing plants; transporting the petroleum or vegetable oil feedstock to the refinery; refining it; transporting it to the dispensing station or facility; and combusting it in the engine (tailpipe emissions).  The complete life cycle includes the benefit of the amount of [GHG's] that the feed stock takes out of the atmosphere, which should be subtracted from the cost enumerated in the preceding sentence.  In the case of petroleum and coal, this benefit would be zero.  In the case of biofuels, this benefit would be quite high.

ADD, 255.  In sum, POP Diesel stated, "the complete life cycle emissions of the fuel is the only correct way to accurately measure the true [GHG's] of various diesel fuels."  Id.

### b.    Electricity to Power Engines

The total extent that EPA considered measuring "the complete life cycle emissions of the [] various diesel fuels," as POP Diesel proposed, was that it considered and rejected the idea, limited to electric vehicles, of taking into account the "upstream" GHG emissions from the generation of electricity at power plants.  Proposed Truck Rule, ADD, 134, 138-39; Final Rule, ADD, 70-71.  In EPA's response to the above-quoted comments of POP Diesel, EPA stated that it could leave regulation of "upstream" emissions to EPA regulatory programs that focus specifically on fuel refineries and power plants.  ADD, 234.  EPA rejected, in favor of the Tailpipe Rule, the notion that it "should reflect upstream GHG emissions impacts (as well as other life cycle emissions impacts such those from tire production

- 11 -

and scrappage) in vehicle compliance values." Id.

Aside from considering the life cycle of tires, which are not a fuel, EPA never considered POP Diesel's broader point of scrapping the Tailpipe Rule in favor of comparing and ranking all fuel types, as enabled by their particular engine technology, according to their complete life cycle GHG emissions, including any carbon sequestration they afford.[7]

To the extent that EPA pointed to regulation of power plants and fuel refineries as a way to account for upstream GHG emissions entailed in electricity generation, both EPA and DOT agree that "the upstream GHG emissions associated with the production and distribution of electricity are higher, on a national average basis, than the corresponding upstream GHG emissions of ... petroleum-based fuels." EPA and DOT, 2017 Model Year Light-Duty Vehicle GHG Emissions and Corporate Average Fuel Economy Standards, Proposed Rule, 76 F.R. 74854, 75010 (Dec. 1, 2011) (quoted and cited in POP Diesel's amended and supplemental petition for reconsideration (ADD, 267)). This is because the United States lacks "a

---

[7] EPA's artfully implying that it did in its denial of POP Diesel's petition is not true. ADD, 27 ("EPA's proposal [] addressed the issue of whether compliance with the standards should be measured on a tailpipe or lifecycle basis, and what if any incentives were appropriate for advanced technologies and alternative fuel vehicles."). The "advanced technologies and alternative fuel vehicles" to which EPA considered giving incentives were limited to hybrid- and all-electric, hydrogen fuel cell vehicles, and Rankine cycle waste heat recovery engines. Proposed Truck Rule (ADD, 138). The Final Rule did not give any incentives to the latter.

comprehensive program for addressing upstream emissions of GHG's," id., and the biggest share of electricity generated nationwide is by the combustion of coal, which produces 25 to 50 percent more carbon dioxide emissions than petroleum. Argonne National Laboratory (cited in amended and supplemental petition for reconsideration (ADD, 267-68)).

Thus, giving electricity-powered vehicles a 100 percent credit under fuel efficiency and GHG emissions standards is irrational.

### c.    Hydrogen to Power Engines

Because hydrogen fuel cell-powered vehicles emit only water and no GHG emissions from the tailpipe, they, like electric vehicles, receive a 100 percent fuel consumption and GHG emission credit under the Tailpipe Rule. However, "[r]eliance on hydrogen to power a mobile engine carries with it the same drawback of electricity: '[t]he main sources of hydrogen currently are hydrocarbon feedstocks, such as natural gas, coal, and petroleum, all of which produce $CO_2$.'" Amended and supplemental petition for reconsideration (ADD, 268-69) (quoting U.S. Energy Information Administration (ADD, 328)).

EPA's consideration and rejection of "upstream emissions" to generate electricity did not take into account the carbon dioxide emitted from fossil fuels used to make hydrogen to power fuel cells. POP Diesel's proposal for a comparative life cycle analysis of all fuels that power trucks includes counting the fossil fuels

necessary to make the hydrogen powering fuel cell-equipped trucks.  It is irrational for the Truck Rule not to count these GHG emissions.

### d.    Fossil Fuel Natural Gas to Power Engines

The Tailpipe Rule gives natural gas-powered heavy duty engines a 20 to 30 percent GHG emissions credit below petroleum-powered engines, due to 20 to 30 percent lower carbon emissions.  ADD, 49.  Yet since natural gas is a fossil fuel, its emissions are by definition going to be a net gain of carbon to the atmosphere, without any corresponding removal of carbon from the atmosphere, as in the case of 100 percent plant oil fuel, a further irrationality of the Truck Rule.

### e.    Biofuels to Power Engines

In contrast to their ignoring upstream emissions that make electricity and hydrogen fuel, EPA and DOT:

> recognize [] that in the context of biofuels, 'upstream emissions' include not only [tailpipe] GHG emissions, but also any net biological sequestration that takes place. When considered on a lifecycle basis (including both tailpipe and upstream emissions), the net GHG emission impact of individual biofuels can vary significantly from both petroleum-based fuels and from biofuel to another.

EPA & DOT, Final Truck Rule, Regulatory Impact Analysis (ADD, 172).  Despite the foregoing recognition, the agencies' regulations do not rank biofuels, for instance, biodiesel versus plant oil fuel, according to their comparative net GHG emissions.

A strong impediment to introduction of POP Diesel's products to the broader

market is policy incentives that fail to correspond with the true, net GHG-reducing potential of the fuel, incentives that the other alternative fuels already receive illogically, to one degree or another, under the Truck Rule.

> **3.    The Only Precise Quantitative Analysis of the Truck Rule's Rebound Effect and Its Indirect Rebound Component Leads to the Conclusion That the Tailpipe Rule Is Counter-productive to the Goals of Reducing Total Overall Energy Consumption and GHG Emissions**

When a truck engine's fuel efficiency improves, the amount of fuel consumed and the cost to operate the engine per weighted mile drops.  The two agencies recognized that this obvious result of the Fuel Efficiency Standards will encourage greater use of these kinds of engines and prompt a "VMT [('vehicle miles traveled')] rebound effect[: ] the fraction of fuel savings expected to result from an increase in fuel efficiency that is offset by additional vehicle use."  ADD, 91.  They explained:

> [Heavy duty] vehicles are used primarily for business purposes.  Since these businesses are profit driven, decision makers are highly likely to be aware of the costs and benefits of different shipping decisions. [ S]hippers are much more likely to take into account changes in the overall operating costs per mile when making shipping decisions that affect VMT.

Id.

### a.    The Agencies' Uncertainty Over the Magnitude of the Rebound Effect

Without precisely quantifying the magnitude of the Truck Rule's resulting rebound effect, they estimated that an increase in vehicle miles that trucks would travel due to economic inducements caused by more fuel efficient engines would lead to a rebound in the range of 5 percent for Class 8 combination tractors to 15 percent for single unit vocational trucks.  ADD, 94.  Previously, in the preamble to their notice of proposed rule-making, the two agencies admitted that "the medium- and heavy-duty rebound effect needs to be studied in more detail" and the "factors [affecting the magnitude of the rebound effect] have not been well studied to date."  ADD, 143.  However, prior to publication of the Truck Rule, the agencies "did not receive any substantive comments" on quantifying the rebound effect.  ADD, 92.  As a result, without any additional information to aid in quantifying the Truck Rule's rebound effect, their estimate of a 5 to 15 percent rebound remained unchanged from the Proposed Truck Rule to the Final Rule.  Cf. ADD, 143 with ADD, 93.

### b.    POP Diesel's Comments to the Administrative Record

POP Diesel stated in its comment to the public docket dated January 28, 2011, as follows:

> The enclosed article from a recent edition of The New Yorker magazine [ADD, 248-52] raises questions about an efficiency-based approach to reducing greenhouse gas

- 16 -

> emissions. In short, while gains in efficiency are commendable as improvements to product quality, they may have the macroeconomic effect of increasing demand for the energy resource in the aggregate over time.

ADD, 246. The reason why POP Diesel did not and could not elaborate more specifically on the rebound effect in its comments, which reason the two agencies were aware of and admitted in their preamble to the Final Rule, was that there were not any studies extant, other than general ones they relied on, that precisely quantified factors contributing to the rebound effect in the commercial trucking sector.

POP Diesel's petition for reconsideration expanded on its comment made during the rulemaking and pointed out that "total overall energy consumption" is a factor that DOT had a statutory obligation to consider in establishing the Fuel Efficiency Standards. S.A. 1, 15 (quoting from 42 U.S.C. § 32902(k)(1)(C)).

### c. Dr. Harry Saunders's Quantified Analysis of the Truck Rule's Rebound Effect

As EPA stated, Dr. Harry Saunders is a published researcher in the field of energy economics. ADD, 26; <u>see</u> Declaration of Dr. Saunders dated Feb. 12, 2012 ("Dr. Saunders's analysis"), S.A. 1, 263 (Saunders resume).[8] An expert's report by Dr. Saunders secured by POP Diesel after publication of the Standards and submitted

---

[8] This copy of Dr. Saunders's analysis includes one hand-written correction by him at its paragraph 63. POP Diesel submitted this version in support of its motion to remand under 49 U.S.C. § 32909(c). The version without this hand-written correction is part of the administrative record in Case No. 12-1427. ADD, 284.

to the two agencies along with POP Diesel's amended and supplemental petition for reconsideration provides the kind of precise quantitative information that the agencies lacked in devising the Truck Rule.  Dr. Saunders's analysis, S.A. 1, 229.

In sum, Dr. Saunders's analysis shows that mandating improvements in the fuel economy of new commercial trucks is not, in fact, a rational surrogate for lowering "total overall energy consumption" by such trucks or thereby reducing their aggregate GHG emissions.  S.A. 1, 247, ¶ 43.  While each new truck will have better fuel economy than before, a form of the rebound effect that the agencies never considered, the embedded energy indirect rebound effect, will actually cause the Truck Rule to increase "total overall energy consumption" and resulting GHG emissions, rather than decrease them.  Id., ¶¶ 29, et seq.

### i.    *Embedded Energy Indirect Rebound Effect*

Indirect, or secondary, rebound effects arise from and go beyond simple measurements of increased vehicle miles traveled and the translation of vehicle miles traveled into energy use and GHG emissions.  For example, with lower trucking fuel costs per weighted mile, consumers use their freight transport savings to order additional products and producers facing lower trucking costs will pass some of the savings onto businesses whom they supply, giving these other businesses an incentive

to spur their own production.[9] As the U.S. Bureau of Transportation Statistics stated: "Productivity growth in freight transportation has long been a driving force for the growth of U.S. overall productivity and contributed directly to the growth of the U.S. GDP." S.A. 1, 238, ¶ 23. Indirect rebound takes account of the additional energy that efficiency standards compel to fuel this new economic activity.

The embedded energy form of indirect rebound, described and quantified beginning at paragraph 45 of Dr. Saunders's analysis until its end, starts from a logical assumption: if there is a direct rebound effect causing an increase in demand for the shipment of additional goods, then these goods require not only more trucks traveling longer miles (direct vehicle-miles-traveled rebound), but also, an additional investment of energy to fabricate the additional goods, "energy that becomes 'embedded' in them and must be accounted for when calculating rebound effects" from fuel efficiency standards. S.A. 1, 249, ¶ 46.

### ii.    *Rebound Backfire from Embedded Energy Indirect Rebound Effect*

Dr. Saunders posits that the agencies' selection of a 5 to 15 percent range for the rebound effect was an underestimate that is inconsistent with the discipline of

---

[9] Id., ¶¶ 15 and 18.  Paragraphs 15 to 24 of Dr. Saunders's analysis describe indirect rebound effects in more concrete terms.  S.A. 1, 235.

economics.[10] His easy-to-read, logical analysis of the Truck Rule's embedded energy rebound consequences starts from the agencies' lowest, best-case, direct vehicle-miles-traveled rebound estimate of 5 percent.  <u>Id.</u>, ¶¶ 45, *et seq.*  From this basis, using data from three federal agencies,[11] Dr. Saunders determined that the Truck Rule's embedded energy indirect rebound effect alone results in a quantified magnitude of rebound on the order of at least 117 percent.  S.A. 1, 262, ¶ 63.  Rebound greater than 100 percent constitutes a "backfire" condition, by which more aggregate energy is consumed, and as a result, more overall GHG emissions produced, than if the Fuel Efficiency Standards were not in place.  <u>Id.</u>, ¶¶ 39, 45, 49, and 62-64.

Given Dr. Saunders's full, reliable and precise measure of a part of the rebound effect that the agencies did not consider, the embedded energy facet of indirect rebound, which other part, direct vehicle-miles-traveled rebound, the agencies admitted they had estimated with great uncertainty, Dr. Saunders concluded that due to a rebound of at least 117 percent, the Truck Rule is counter-productive to its goals of reducing "total overall energy consumption" and resulting GHG emissions.  S.A. 1, 247-48, ¶¶ 43-44.

---

[10] <u>Id.</u>, ¶ 35.

[11] <u>Id.</u>, ¶¶ 7 and 51, <u>et seq.</u>

4.   **POP Diesel Had Good Reason for Not Submitting Some Material Evidence to the Two Agencies Until After Publication of the Truck Rule**

POP Diesel's petition for reconsideration included twelve exhibits. Its amended and supplemental petition for reconsideration also included twelve exhibits, of which the second half, excepting the latter's Exhibit 9, were duplicates of exhibits to the original petition. <u>Cf.</u> S.A. 1, 19-223 <u>with</u> ADD, 345-361. Because DOT claims never to have received the first set of exhibits, a claim POP Diesel disputes <u>infra</u>, and because EPA denied POP Diesel's petition for reconsideration in part on the grounds that "all of the objections or claims raised in POP Diesel's petition could have been presented to EPA during the rulemaking,"[12] it is necessary for POP Diesel briefly to describe these documents, the reasons why it had to submit them when it did, and its manner of service on DOT.

Along with its amended and supplemental petition for reconsideration, POP Diesel submitted to the two agencies Dr. Saunders's analysis of the Truck Rule's rebound effect the day after Dr. Saunders signed it on February 12, 2012. S.A. 1, 229. As set forth above, the two agencies had solicited, but not received, any analyses quantifying the rebound effect from the Truck Rule, until POP Diesel secured and submitted Dr. Saunders's. POP Diesel's comments to the administrative

---

[12] ADD, 26.

record were as specific on this subject as possible at that time.

A second set of documents that POP Diesel could not acquire and submit to the two agencies until after publication on September 14, 2011 of the Truck Rule demonstrated the technological feasibility of using 100 percent plant oil fuel in novel, POP Diesel-equipped engines throughout the medium- and heavy-duty trucking sector.[13]

---

[13] A report of emissions laboratory testing showed that a POP Diesel-equipped diesel engine's emissions of all criteria pollutants regulated by the CAA were no worse when this engine was operating on 100 percent jatropha plant oil fuel than when it was operating on standard, No. 2 petroleum diesel. As is stated on its title page, this testing of POP Diesel's enabling equipment and 100 percent jatropha plant oil fuel concluded on November 13, 2011. S.A. 2, 275. POP Diesel submitted the draft version of this report, id., to the two agencies along with its petition for reconsideration the next day, on November 14, 2011, and the finalized report, along with POP Diesel's amended and supplemental petition for reconsideration on February 13, 2012. S.A. 2, 365. Exhibit 11 to POP Diesel's petition for reconsideration included a report on the jatropha plant oil used in this successful emissions testing, which report was completed for POP Diesel, as stated on its cover page, on October 30, 2011. S.A. 1, 191. POP Diesel submitted this report along with its petition for reconsideration as a supplement to the emissions testing completed on November 13, 2011.

Other exhibits substantiating the technological feasibility of POP Diesel's equipment and alternative fuel, which POP Diesel also submitted to the two agencies on November 14, 2011, include transcripts of two sworn depositions that POP Diesel had not been able to conduct until October 25 and 26, 2011 and documents subpoenaed in conjunction with one of these depositions. Exhibits 7 and 10 to POP Diesel's petition for reconsideration are the deposition transcripts, whose title pages state the dates conducted. S.A. 1, 87 and 109. Petition for reconsideration Exhibits 1 and 6 are the subpoenaed documents and Exhibit 9, a statement about the use of 100 percent plant oil fuel, that surfaced as a result of the subpoena *duces tecum*. S.A. 1,

(continued...)

- 22 -

Since POP Diesel perceived that the two agencies did not consider POP Diesel's objection specifically stated in its comments submitted to the administrative docket that the GHG Emissions Standards need to be based on a lifecycle analysis of the various fuels used in truck engines, POP Diesel submitted evidence supporting this point, Exhibits 3 to 5 to its amended and supplemental petition for reconsideration. POP Diesel described this evidence, along with citing to other authoritative sources, in that petition's section running from its pages 6 to 13 and titled, "The Regulations Are Arbitrary and Capricious in the GHG-Reducing Weight They Give to Alternative Technologies and Fuels." ADD, 265.

With regards to the twelve exhibits that DOT claims not to have had before it in support of POP Diesel's original petition for reconsideration, DOT, by the National Highway Transportation Safety Administration, admitted that it received this petition. ADD, 21. A certificate of service to POP Diesel's petition for review filed in Case Number 11-1441 on November 14, 2011 states that POP Diesel served by hand delivery on that date a copy of this petition on the Secretary of DOT at its headquarters address. Doc. 1341785. Undersigned counsel hand-served the petition

---

[13] (...continued)
18, 81 and 100. As set forth in the corresponding petition for reconsideration, S,A. 1, 7-13, the transcripts, testimony of the representative of the Engine Manufacturers Association (S.A. 1, 87) and fuel injection equipment manufacturer Robert Bosch, LLC (Exhibit 7, S.A. 1, 87), debunked dated evidence and myths that previously denigrated the use of 100 percent plant oil in diesel engines.

together with its twelve exhibits on a representative of DOT's Office of General Counsel. As is confirmed in two declarations of Martin Convisser, who assisted in assembling the petition and its exhibits into a black, three-ring binder and who accompanied undersigned counsel in performing this service on that date, this petition included all twelve exhibits that DOT complains it did not receive. S.A. 1, 224-28 (declarations previously filed in support of POP Diesel's motion to supplement the record).

Therefore, POP Diesel renews its request that the Court consider the twelve exhibits listed at the beginning of POP Diesel's Supplemental Appendix, Volume 1, as part of the administrative record that was before DOT concerning POP Diesel's petition for reconsideration of the Fuel Efficiency Standards and POP Diesel's request to remand.

## Case No. 11-1428

This case challenges the Truck Rule on the basis of two alternate grounds. First, EPA neglected to comply with a nondiscretionary statutory duty to make the Truck Rule available to the Science Advisory Board for peer review before the rule was promulgated, in violation of 42 U.S.C. § 4365(c)(1). Second, in the alternative, EPA's failure to submit the rule to SAB was so serious and related to matters of such central relevance to the Truck Rule that, under a provision of the Clean Air Act, 42 U.S.C. § 7607(d)(8), there is a substantial likelihood that the rule would have been

significantly changed if EPA had submitted it to the Science Advisory Board.

In addition, the intervention motions of the Government Movants and the Environmental Group Movants were not timely filed.  Although the issues regarding the intervention motions have been fully briefed, this Court ordered the parties to include their arguments regarding the intervention motions in the briefing to the Merits Panel.  Doc. 1366117, March 28, 2012.  Accordingly, this brief addresses the California Petitioners' objections to the intervention motions.

## SUMMARY OF ARGUMENT

### Case Nos. 11-1441 and 12-1427

1.    By statute, DOT must consult with EPA in promulgating fuel efficiency standards for trucks.  Title 49 U.S.C. § 32909(c) authorizes this Court to order DOT, and by implication EPA, to "receive" additional submissions tendered by POP Diesel that are "material" to the Truck Rule and that POP Diesel had "reasonable grounds" for not submitting during the rulemaking.  EPA has a nondiscretionary duty to reconsider the Truck Rule based on POP Diesel's submissions meeting similar criteria under 42 U.S.C. § 7607(d)(7)(B).

POP Diesel's evidence of the technological feasibility of its enabling engine equipment and 100 percent jatropha oil fuel, including EPA's and the National Highway Transportation Safety Administration's approvals of them, warrants a remand, as does Dr. Saunders's determination that the Fuel Efficiency and GHG

Emissions Standards will backfire due to the rebound effect and the two agencies' failures to consider POP Diesel's lifecycle GHG objection to the Tailpipe Rule. The agencies' promise to "reinforce" the Truck Rule in future regulations compels this Court to address POP Diesel's objections now, rather than later.

2.    The Tailpipe Rule fails to satisfy EPA's duty to move to slow or reduce global warming because it favors some fuels and their corresponding technologies over others by the arbitrary and capricious snapshot of how much carbon they release from the tailpipe, without taking into account their comparative, true lifecycle GHG emissions. An alternative way of harmonizing the Truck Rule's two sets of Standards, based on POP Diesel's objections, would be to measure fuel consumption according to the fossil fuel content of the fuel and rank the GHG emissions of different engine technologies and fuels according to their net lifecycle values. This method would penalize the use of fossil fuels while rewarding alternative fuels according to rational criteria that correspond with the statutory goals of reducing overall fossil fuel consumption and GHG emissions. The two agencies have never considered such a method.

3.    The Truck Rule's sole means of accounting for 100 percent jatropha plant oil fuel as "biomass-based diesel" under EPA's Renewable Fuel Standard fails as a matter of law because EPA has not designated this fuel for registration pursuant to 42 U.S.C. § 7545(a) and 40 C.F.R. Part 79. Such EPA designation is a prerequisite

for classification as "biomass-based diesel" and eligibility for tradable credits thereunder. 40 C.F.R. § 80.1401 (ADD, 14).

4.    An expert analysis by Dr. Harry Saunders presented information that DOT and EPA unsuccessfully sought comment on: quantifying the aggregate energy rebound effect, and consequent GHG emissions, arising from improved fuel efficiency and resultant lower trucking costs. Dr. Saunders quantified, specifically, the indirect embedded energy component of the rebound effect, which component the two agencies never considered. Because DOT and EPA ignored Dr. Saunders's conclusion that the embedded energy indirect rebound effect will actually cause a backfire in "total overall energy consumption," DOT failed in its duty to consider this factor under 49 U.S.C. § 32902(k)(1)(C) and it was irrational for EPA to rely on the agencies' rebound effect computation to calculate GHG emissions savings.

### Case No. 11-1428

The motions to intervene were filed after the applicable 30-day filing deadline, Fed. R. App. P. 15(d) and 26(a)(1), and the movants did not avail themselves of the only available relief from that deadline, which authorizes extensions of time if an appropriate motion is made at least five days before the filing deadline. D.C. Cir. Rule 27(h). Accordingly, there is no basis upon which to grant the untimely motions to intervene.

Regarding the substantive issues, Congress mandated that EPA seek scientific

and technical peer review of its regulatory proposals from an external blue-ribbon panel of experts, known as the Science Advisory Board ("SAB"). The SAB submittal requirement applies to all of EPA's regulatory actions proposed under any statute that it administers. The purpose of the SAB requirement is to ensure that EPA's regulatory judgments are sound, and EPA's duty to seek peer review from the SAB is nondiscretionary. Here, EPA promulgated the Truck Rule without first making it available to the SAB for peer review, thereby violating the mandatory duty set forth in 42 U.S.C. § 4365(c)(1).

Alternatively, EPA violated a statutory provision located exclusively in the CAA, 42 U.S.C. § 7607(d)(8), which is applicable only to procedural violations of the CAA. Assuming *arguendo* that 42 U.S.C. § 7607(d)(8) applies here, EPA's failure to submit the Truck Rule to the SAB was so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed had EPA sought SAB peer review.

Under either alternative argument, this Court should vacate the Truck Rule and remand it to EPA, with instructions to comply with the SAB submittal requirement if EPA wishes to reinstate the rule.

## STANDARD OF REVIEW

The Court sets aside agency action or inaction when (1) the agency fails to comply with a nondiscretionary statutory duty, *Bennett v. Spear*, 520 U.S. 154, 172 (1997); (2) the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law,", 42 U.S.C. § 7607(d)(9), 5 U.S.C. § 706; (3) the action contradicts congressional intent *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843 n.9 (1984); (4) the agency gave an "[im]permissible construction" to a specific issue on which statutory language is silent or ambiguous, id. 467 U.S. at 843; (5) "the record shows all relevant factors were [not] considered and the agency [failed to] articulate[] a 'rational connection between the facts found and the choice made,'" *Arkema, Inc. v. EPA*, 618 F.3d 1, 6 (D.C. Cir. 2010) (quoting from *Catawba County, N.C. v. EPA*, 571 F.3d 20, 41 (D.C. Cir. 2009)); or in the case of EPA, (6) it fails "to give reasoned responses to all significant comments in a rulemaking proceeding" or "to respond to specific challenges that are sufficiently central to its decision." *Int'l Fabricare Instit. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992) (cites omitted).

## STANDING

## Case Nos. 11-1441 and 12-1427

POP Diesel, a regulated entity under both the Fuel Efficiency and the GHG Emission Standards, is in the business of manufacturing and selling (1) diesel engine equipment, which both EPA and NHTSA have approved for installation on select on-highway diesel engines, and (2) EPA-approved jatropha plant oil fuel for use at 100 percent concentration in diesel engines that have the Company's enabling equipment installed. This fuel substitutes for fossil fuel consumption and it produces lower lifecycle GHG emissions than both petroleum diesel and competing alternative fuels, though higher tailpipe carbon emissions. The complete lack of recognition in the Truck Rule for the benefits of POP Diesel's products, especially when compared to the alternatives that the Truck Rule favors, leaves POP Diesel immediately and severely aggrieved and presents a "case or controversy" under Article III of the United States Constitution. The declaration of POP Diesel's President Claude D. Convisser appearing in POP Diesel's Supplemental Addendum regarding Standing, at page 82 appended to this Brief, addresses constitutional and prudential standing issues with factual precision under both the GHG Emissions and Fuel Efficiency Standards and their authorizing statutes.

## Case No. 11-1428

Declarations of the California Petitioners are in the California Petitioners' Addendum (Appendix B). Petitioners Dalton Trucking, Inc. and Delta Construction Company, Inc. own and operate businesses that utilize trucks subject to the Truck Rule, they are concretely injured by the rule because the rule will increase their costs of doing business by increasing the price of new trucks used in their businesses when their existing vehicles reach the end of their useful lives, and the relief requested will redress those injuries because the prices of the trucks would no longer be affected the rule. Klenske Decl. ¶¶ 3-11, Appendix B-17 to B-18; Norman Brown Decl. ¶¶ 3-11, Appendix B-6 to B-7; *See, e.g., Ctr. For Energy & Econ. Dev. v. EPA*, 398 F.3d 653, 656-58 (D.C. Cir. 2005) (standing criteria for individual company standing). Petitioner California Construction Trucking Association, Inc., ("CCTA") is a trade association representing businesses and individuals who are concretely injured by the Truck Rule in that they utilize trucks subject to the Truck Rule, the rule increases their costs of doing business by increasing the price of trucks used in their businesses when their existing vehicles reach the end of their useful lives, and their injuries will be redressed if the court grants the relief requested. Lee Brown Decl. ¶¶ 2-10, Appendix B-2 to B-4; *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (criteria for associational standing). Accordingly, Petitioners have Article III standing. *See* D.C. Cir. Rule 28(a)(7).

If any one of the California Petitioners has standing, the case may proceed.

*Americans for Safe Access v. Drug Enforcement Administration*, 706 F.3d 438, 443

(D.C. Cir. 2013).  Accordingly, this challenge to the Truck Rule presents a "case or

controversy" under Article III of the United States Constitution.  *See* D.C. Cir. Rule

28(a)(7).

# ARGUMENT

## Case Nos. 11-1441 and 12-1427

### I

**IT WAS INCONSISTENT WITH LAW FOR EPA AND DOT TO DENY THE MATERIALITY AND CENTRAL RELEVANCE OF DIESEL'S POST-RULE PUBLICATION SUBMISSIONS, WHICH POP DIESEL COULD NOT SUBMIT EARLIER, AND POP DIESEL'S ADDITIONAL SUBMISSIONS NOW COMPEL A REMAND TO THE TWO AGENCIES.**

When reviewing a motor vehicle fuel efficiency standard, this Court, on the request of the petitioner:

> may order the Secretary [of Transportation] to receive additional submissions if the [C]ourt is satisfied that the additional submissions are material and there were reasonable grounds for not presenting the submissions in the proceeding before the Secretary.

49 U.S.C. § 32909(c)(1).  The Secretary may then "amend or set aside the regulation, or prescribe a new regulation, because of the additional submissions presented."  49 U.S.C. § 32909(c)(2).  Because the authorizing statute for the Fuel Efficiency Standards requires DOT to "consult" with EPA in their promulgation,[14] POP Diesel requests that the Court order both DOT and EPA "to receive" and (i) reconsider POP Diesel's additional submissions already made to them constituting its petition and

---

[14] 49 U.S.C. § 32902(k)(2).

- 33 -

amended and supplemental petition for reconsideration and (ii) consider POP Diesel's new submissions presented herewith.

A person has a right to petition the United States government for redress of grievances. U.S. Const'n, Amendment I. If a person "raising an objection [to a rule] can demonstrate to the Administrator [of EPA] that it was impracticable to raise such objection" during a rulemaking governing GHG emissions pursuant to 42 U.S.C. § 7521(a), "or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, [EPA] shall convene a proceeding for reconsideration of the rule." 42 U.S.C. § 7607(d)(7)(B). EPA's determination on a petition for reconsideration concerns a non-discretionary legal duty. *Coalition for Responsible Regulation*, 684 F.3d at 126 (use of "shall" vests non-discretionary duty in EPA).

## A.  POP Diesel's Additional Submissions Were and Are Material and Centrally Relevant to the Truck Rule

EPA considers an objection that is "of central relevance to the outcome of a rule" if it "'provides substantial support for the argument that the regulation should be revised.'" Id., 684 F.3d at 125. 77 F.R. at 51702.

- 34 -

### 1. Dr. Saunders's Analysis of the Rebound Effect

Had the two agencies paid heed to Dr. Saunders's analysis, they would have constructed fundamentally different sets of fuel efficiency and GHG emissions standards, as set forth in Part II below.    EPA, however, tried to side-step this outcome, as follows.

EPA cited as a reason for disregarding Dr. Saunders's quantified analysis of the Truck Rule's rebound effect, submitted to the two agencies on February 13, 2012, that POP Diesel's "grounds for objection arose after [] the time specified for judicial review," *i.e.*, longer than sixty days after publication of the Rule on September 15, 2011.  42 U.S.C. § 7607(d)(7)(B) (cited at ADD, 27).  However, POP Diesel had previously raised the magnitude of rebound effects as grounds for objecting to the Truck Rule "with reasonable specificity" both in its comments to the administrative record and in its timely-served petition for reconsideration.  Id.

If POP Diesel had believed, as EPA stated that EPA did, that POP Diesel's grounds for seeking review in this Court were "based solely on grounds arising after such sixtieth day" following publication of the Truck Rule, then POP Diesel could have filed a separate petition for review "within sixty days after such grounds ar[o]se." 42 U.S.C. § 7607(b)(1).  Instead, POP Diesel believed that it had stated its rebound effect objection sufficiently to EPA during the rulemaking and by its petition for reconsideration served on November 14, 2011, within sixty days of the Rule's

publication.  Therefore, POP Diesel served on EPA and DOT its amended and supplemental petition for reconsideration, including Dr. Saunders's analysis.  Within sixty days of EPA's denial, POP Diesel filed its petition for review in Case Number 12-1427, consolidated herein.  Doc's 1401161 and 1404618.  This Court has previously held that the time limit under 42 U.S.C. § 7607(b)(1) will not necessarily bar a petition for review if EPA has authority to consider the subject matter at hand. *Sierra Club v. EPA*, 705 F.3d 458, 467 (D.C. Cir. 2013).

Whether or not Dr. Saunders's analysis constituted a wholly new objection to the Truck Rule by POP Diesel, EPA had a full opportunity to address it leading up to EPA's denial of POP Diesel's petition and amended and supplemental petition for reconsideration.  EPA availed itself of the opportunity to address Dr. Saunders's analysis, as set forth in Part IV below.

Furthermore, POP Diesel's renewed request under 49 U.S.C. § 32909(c) to order DOT and EPA "to receive" this and POP Diesel's other post-Rule publication submissions is not constrained by the time limit set forth in 42 U.S.C. § 7607(d)(7)(B).  Either agency's determination on remand, based on Dr. Saunders's analysis, that its previous estimates of "total overall energy consumption"[15] were legally deficient would render EPA's reliance on such previous estimates irrational

---

[15] 49 U.S.C. § 32902(k)(1)(C).

and therefore, require EPA revision of the GHG Emissions Standards. *Arkema*, 618 F.3d at 6. A remand to both agencies is necessary.

**2. The Technological Feasibility of POP Diesel's Enabling Engine Equipment and 100 Percent Jatropha Oil Fuel as Illustrating the Need to Rank of Engine-enabled Fuels According to Their Lifecycle Ghg Emissions**

Since technological feasibility is a precondition to regulatory acceptance,[16] EPA's and NHTSA's subsequent approvals of POP Diesel's engine equipment and sale and use of 100 percent jatropha plant oil fuel in select diesel engines, which POP Diesel is ready to replicate in heavy duty engines, provide fresh evidence for this Court to remand the Truck Rule to the two agencies, pursuant to 49 U.S.C. § 32909(c). See S.A. 1, 266. This evidence supplements the evidence of technological feasibility that POP Diesel submitted during the rulemaking and by petition afterwards.

As set forth in Part II below, nor did they consider POP Diesel's broader point about the irrationality of the Tailpipe Rule, despite POP Diesel's reasonably specific comments requesting award of relative GHG credits based on the full lifecycle GHG emissions of a fuel.

---

[16] 76 F.R. at 57129 (ADD, 54).

## B. It Was Evident from the Face of the Documents That Pop Diesel Could Not Make its Key Submissions During the Rulemaking Because They Did Not Exist Then

As EPA pointed out in its denial, neither POP Diesel's petition for reconsideration, nor its amended and supplemental petition for reconsideration, contained argument as to why POP Diesel could not have submitted its exhibits that accompanied each petition during the rulemaking. ADD, 25-26. However, the governing statue does not require argument; it only requires a "demonstrat[ion]." 42 U.S.C. § 7607(d)(7)(B). As set forth above, the reasons were self-evident upon examining the dates of origin on the faces of the key documents themselves. Emissions testing on POP Diesel's recently-patented equipment, a report on the 100 percent jatropha plant oil fuel used in this testing, and transcripts of depositions conducted and corresponding documents subpoenaed were not in existence, and could not have been generated, until dates after the rulemaking docket closed or the agencies published the Truck Rule.

## C. EPA's Ignoring its Legal Duty to Commence a Reconsideration Proceeding Compels a Remand

Because POP Diesel's submissions to EPA made by way of its petition and amended and supplemental petition for reconsideration were of central relevance to the GHG Emissions Standards and POP Diesel could not have actually submitted them during the rulemaking, EPA breached its duty set forth at 42 U.S.C. §

7607(d)(7)(B) and this Court must order a remand for amendment of these Standards.

## D.  This Is an Appropriate Case for the Court to Remand and Vacate

There is not any published caselaw interpreting 49 U.S.C. § 32909(c).  In the only reported case interpreting an analogous statutory provision,[17] dealing with NHTSA's reduction of a motor vehicle bumper safety impact test ("the Bumper Standard") from 5.0 to 2.5 miles per hour, this Court determined, "This is not an appropriate case in which to exercise" the Court's discretion to order a remand to NHTSA.  *Center for Auto Safety v. Peck*, 751 F.2d 1336 (1985).  This Court reasoned that "a remand would simply produce judicial interference in an ongoing agency review," since "[f]ederal bumper standards have been subject to review, revision, and proposed revision from the moment they were first promulgated" thirteen years before.  751 F.2d at 1343, 1369.

In contrast, it is evident that DOT and EPA do not have underway a review of the Tailpipe Rule or the Truck Rule's rebound effect.  They have failed to supplement their Truck Rule docket, as they have a legal duty to, with any documents pertaining to these subjects, other than those furnished by POP Diesel in support of reconsideration, "which become available after the proposed rule has been published

---

[17] 15 U.S.C. § 1913(b) (repealed in 1994) (analogous provision now codified at 49 U.S.C. § 32503(c)).

and which [EPA] determines are of central relevance to the rulemaking." 42 U.S.C. § 7607(d)(4)(B)(i).

The Bumper Standard, in its various guises, was not delimited in time, but was prospective to the end of time, a condition that lent itself to ongoing agency review. See 751 F.2d at 1338-42. In contrast, the GHG Emissions Standards begin in 2014 and the Fuel Efficiency Standards in 2016 and they are in effect through 2018. DOT and EPA have stated that they will develop "a second phase of regulations to reinforce these initial rules and achieve further reductions in GHG emissions and fuel consumption reduction for the mid- and longer-term time frame (beyond 2018)." ADD, 33 (emphasis added). However, a predisposition to build on the approach of the Truck Rule in future regulations, the proclaimed goal of DOT and EPA, will be erroneous if the baseline, existing Truck Rule is arbitrary, capricious or inconsistent with law. 42 U.S.C. § 7607(d)(9).

The Court in Center for Auto Safety identified two additional factors relevant to a request like POP Diesel's to remand the Truck Rule to the agencies for further proceedings: "the length of the rulemaking process that would be reopened and the cost to the public of delay in implementation of the rule." 751 F.2d at 1370. The process to establish truck fuel efficiency standards that take into account accurate, "total overall energy consumption" and lifecycle GHG emissions standards that give credit to POP Diesel's beneficial engine equipment and fuel need not take long. 49

U.S.C. § 32902(k)(1)(C).  The public would benefit from reopening the rulemaking

process and avoiding the endangerment to health and welfare that the Truck Rule will

impose by an increase total overall energy consumption and GHG emissions, if this

Rule is left intact.

## II

### THE TRUCK RULE IS ARBITRARY AND CAPRICIOUS BECAUSE IT MEASURES FUEL EFFICIENCY AND GHG EMISSIONS SOLELY BY TAILPIPE CARBON EMISSIONS, RATHER THAN BY THE ENGINE-ENABLED FUEL'S LIFECYCLE GHG EMISSIONS.

EPA has a duty to "take steps to *slow* or *reduce*" global warming. *Massachusetts v. EPA*, 549 U.S. 497, 525 (2007) (emphasis supplied) (duty subject to an endangerment finding); *Coalition for Responsible Regulation*, 684 F.3d 102 (affirming EPA's endangerment finding).

There is nothing sacrosanct about the Tailpipe Rule. Petitioners in *Coalition for Responsible Regulation*, the only previous case addressing it, "d[id] not challenge the substantive standards of the Rule." 684 F.3d at 126. "EPA [is not] required to treat [the National Highway Transportation Safety Administration]'s proposed regulations as establishing the baseline for the Tailpipe Rule." *Coalition for Resp. Reg'n*, 684 F.3d at 127. See supra note 2. "'[T]hat DOT sets mileage standards in no way licenses EPA to shirk its environmental responsibilities,' because EPA's duty to promulgate emissions standards derives from 'a statutory obligation wholly independent of DOT's mandate to promote fuel efficiency.'" *Coalition for Resp. Reg'n*, 684 F.3d at 127 (quoting *Mass. v. EPA*, 549 U.S. at 532).

It is not POP Diesel's obligation to present a fully formed, rational framework for fuel consumption and GHG emission regulations, in lieu of the Tailpipe Rule.

- 42 -

POP Diesel simply complains that the Tailpipe Rule is anything but "fuel-neutral," as the agencies contend.  ADD, 23.  It favors some fuels and their corresponding engine technologies over others by the arbitrary and capricious snapshot of how much carbon they release from the tailpipe.  42 U.S.C. § 7607(d)(9).  It creates indirect incentives to put more fossilized carbon into the atmosphere, which only hastens, not slows, global warming.  Consideration of alternative structures will help to demonstrate the illogic of the Tailpipe Rule.

A sensible way to measure the fuel consumption of alternative powered vehicles, as compared with gauging tailpipe carbon dioxide emissions, would be to base it on gasoline or petroleum diesel energy equivalency.  ADD, 23 (citing ADD, 48-50) (the NPRM proposed this method)).  In other words, How many gallons of 100 percent jatropha plant oil fuel will produce the same amount of work as a gallon of petroleum diesel?

However, EPA and DOT, on the President's Executive Order, seek to "harmoniz[e]" fuel efficiency and GHG emissions standards.[18]  Measuring fuel consumption by gasoline or petroleum energy equivalency fails to translate fuel consumption into GHG emissions.  EPA denied POP Diesel's petition for reconsideration on the mistaken belief that the Tailpipe Rule is the only way to

---

[18] ADD, 21 and note 5 thereto.

- 43 -

harmonize these two sets of Standards.  ADD, 29.  This is not true.

A rational way to harmonize the goals of both sets of regulations so as to avoid the arbitrary and counterproductive Tailpipe Rule would be to define "fuel" as "fossil fuel," a method that the two agencies altogether failed to consider.  Since the originating statute is silent as to the definition of "fuel,"[19] yet it directs the agencies to determine "appropriate [] methodologies for measuring the fuel efficiency of" trucks,[20] the agencies may adopt any "permissible" interpretation of the word "fuel." *Chevron*, 467 U.S. at 843.  Certainly, this proposed definition of "fuel" as "fossil fuel" is rational, as compared to the Tailpipe Rule, which bases its definition of "fuel" not on fuel, but on emissions, specifically, carbon emissions.  76 F.R. at 57123-26 and 49 C.F.R. part 535 (76 F.R. at 57493, et seq.).

Because fossil fuels are the specific culprits whose GHG emissions are causing the harm of global warming, if the agencies were to redefine fuel consumption as the content of fossilized carbon in a fuel that an engine was EPA-certified to run on, be it from coal-fired electricity, petroleum, or natural gas, then EPA and DOT would, indeed, fire a single stone at the fuel efficiency and GHG emissions birds.

Actually killing them both with this stone would require adoption of POP Diesel's proposal to take into account the full life cycle carbon emissions of the fuel

_____

[19] 49 U.S.C. § 32902(k).

[20] 49 U.S.C. § 32902(k)(1)(A).

source in calculating GHG emissions and awarding GHG credits.   While the definition of "fuel consumption" as fossilized carbon content would earn engines that run on less fossil fuel a better fuel efficiency rating,[21] the GHG side of the coin would require rationally calibrating GHG-reducing credits according to the relative GHG-mitigating value of the fuel.   The only way to gauge the true GHG-mitigating merit of fuels and their enabling engine technologies is by measuring the fuels' full, net life-cycle carbon emissions.

The Green Truck Association encapsulated POP Diesel's idea in its comments to the administrative docket: "Incentive credits could be crafted based on a combination of [petroleum] oil displacement and GHG reduction."   EPA-HQ-OAR-2010-0162-1596, at 3.   POP Diesel's proposal for accomplishing this goal is an idea that DOT and EPA have never taken up for consideration.   Because POP Diesel's objections go to the heart of both the Fuel Efficiency and GHG Emissions Standards, the Tailpipe Rule, the two agencies erred as a matter of law in not considering them or granting POP Diesel's petition for reconsideration on these grounds.   A remand and vacatur are appropriate for Standards that are arbitrary and capricious.

---

[21] In this way, natural gas fuel would be penalized less than petroleum diesel, but the Truck Rule's irrational favor of natural gas over more GHG-ameliorative solutions, such as 100 percent jatropha plant oil fuel, would disappear.

**III**

**THE TRUCK RULE'S INCORPORATION BY REFERENCE OF THE RENEWABLE FUEL STANDARD FAILS IN THE CASE OF POP DIESEL'S 100 PERCENT JATROPHA PLANT OIL FUEL.**

Congress established a renewable fuel program to give incentives for the production of biofuels for use in motor vehicles and other platforms. 42 U.S.C. § 7545(o). EPA implemented this mandate by adopting Renewable Fuel Standard ("RFS") regulations that award tradable credits for eligible biofuels. 40 C.F.R. Part 80, Subpart M, §§ 1400, et seq. The Preamble to the Truck Rule states, "For the fuels covered by the [RFS] additional incentives are not needed in this regulation." ADD, 49. However, if POP Diesel's 100 percent jatropha plant oil biofuel is not covered by the RFS, the implication is that "additional incentives" are needed, though the Truck Rule does not give any.

In its denial of POP Diesel's petition, EPA stated that POP Diesel's eligibility for RIN credits "is properly considered under the RFS program" and it cited to the category therein of "biomass-based diesel fuel" as the GHG regulatory salvation for 100 jatropha plant oil fuel. ADD, 28. The definition of "biomass-based diesel" fuel[22] would require 100 percent jatropha plant oil fuel to be registered with EPA as a motor vehicle fuel, which is dependent on EPA's designating such fuel for registration

---

[22] 40 C.F.R. § 80.1401.

under 42 U.S.C. § 7545(a) and 40 C.F.R. Part 79. EPA has not taken this separate regulatory step, despite POP Diesel's providing, as part of its amended and supplemental petition for reconsideration, the predicate documentation for EPA to do so: a Pathway Description in Application for a Renewable Identity Number under the RFS for 100 percent jatropha plant oil diesel engine fuel. S.A. 2, 328. In short, because the RFS leaves POP Diesel completely empty handed, so does the Truck Rule.

# IV

**THE TRUCK RULE IS INCONSISTENT WITH LAW SINCE THE ONLY EVIDENCE PRECISELY QUANTIFYING THE MAGNITUDE OF ITS FUEL EFFICIENCY REBOUND EFFECT, CONCERNING ITS EMBEDDED ENERGY INDIRECT COMPONENT THAT DOT AND EPA NEVER CONSIDERED, IS THAT THIS RULE WILL INCREASE BOTH TOTAL OVERALL ENERGY CONSUMPTION AND CONSEQUENT GHG EMISSIONS.**

DOT, "in consultation with" EPA, has a duty to determine by rulemaking "how to implement a commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency improvement program designed to achieve the maximum feasible improvement." 49 U.S.C. § 32902(k)(2). This rulemaking was to follow on the agencies' examination of a variety of factors influencing this fuel efficiency, including "total overall energy consumption," which they had a nondiscretionary duty to consider. 49 U.S.C. § 32902(k)(1)(C). EPA utilized DOT's measure of fuel efficiency, the amount of carbon exiting a truck's tailpipe, as the primary measure of compliance with its own obligation to "take steps to *slow* or *reduce*" GHG accumulation in the atmosphere. *Mass. v. EPA*, 549 U.S. at 525 (emphasis supplied). EPA had the discretion to make this choice, provided there was a "rational connection between the facts found and the choice made." *Catawba County, N.C. v. EPA*, 571 F.3d at 41.

The two agencies confined their consideration of the rebound effect to increased vehicle miles traveled that would directly result through various

mechanisms from the Fuel Efficiency Standards.

It is without doubt that the agencies did not consider, beyond dismissing summarily, the kinds of indirect rebound effects, beyond simply increased vehicle miles traveled (VMT), that the Fuel Efficiency Standards will cause, as determined by Dr. Saunders in his analysis. See, e.g., ADD, 92 (describing the agencies' estimate of rebound as between 5 and 15 percent as being "VMT impacts"). The National Highway Transportation Safety Administration never claimed that DOT's rebound estimates went beyond "the historical response of the use of trucking services to measures of economic activity," in other words, increased vehicle miles traveled. Id. This measure of economic activity, limited to trucking services, did not count all the indirect, additional energy necessary to generate the additional economic activity that improved fuel efficiency spawns, as quantified by Dr. Saunders with respect to the Truck Rule between paragraphs 45 and the end of his analysis. S.A. I, 249.

Rather than point out any flaws in the reasoning or mathematics of Dr. Saunders's quantifying of the Truck Rule's embedded energy indirect rebound effect, which it was unable to do, the National Highway Transportation Safety Administration stated in a conclusory way that "any increases in economy-wide energy consumption and GHG emissions resulting from indirect rebound effects cannot reasonably be ascribed to the requirement that vehicle manufacturers achieve higher fuel efficiency levels." ADD, 23. Similarly, EPA side-stepped any reasoned

critique of Dr. Saunders's analysis and ignored his conclusions to state that it "is not aware of any data to indicate that the magnitude of the indirect rebound effects ... would be significant for this rule."  ADD, 27.

The National Highway Transportation Safety Administration shrugged off any negative association between increased economic activity and a gross increase in energy expenditure by offering that this result of the Fuel Efficiency Standards "undoubtedly add[s] significantly to the economic benefits of the [R]ule." Id. While this statement may be true, material wealth is not one of the factors "affect[ing] commercial [] truck fuel efficiency" that Congress authorized DOT to consider in formulating the Fuel Efficiency Standards.  49 U.S.C. § 32902(k)(1)(C).  It is also worth noting, in balance to the economic wealth that indirect rebound effects are associated with creating, that the high end of Dr. Saunders's estimate of the embedded energy rebound effect is 1408 percent.  S.A. I, 262, ¶ 63.  In other words, the economic spur of Fuel Efficiency Standards could lead to the expenditure of fourteen times as much energy as these Standards will save from the operation of more fuel efficient engines.  Such magnitude of rebound could overwhelm consideration of economic benefits in any future cost-benefit analysis.

EPA avoids a hard look at Dr. Saunders's analysis by simplistically calling the conclusions that he draws from the federal agency data he evaluates "speculative." ADD, 27-28.  EPA's disbelief of Dr. Saunders's conclusion of a backfire due to the

embedded energy rebound effect would be more understandable if the agency assigned any flaws whatsoever to Dr. Saunders's assumptions or method, but it did not.

Instead, EPA cited two outside factors that it argued raise a question as to Dr. Saunders's quantifying a rebound effect of at least 117 percent. ADD, 28. First, EPA argued that market barriers may diminish the fuel cost savings realized from the Fuel Efficiency Standards that trucking firms pass along to consumers. Id. (citing to 75 F.R. at 74320 (J.A., XXXX) and ADD, 94-95). Second, EPA stated, "upfront vehicles costs," which are "transaction or transition costs associated with the adoption of new technologies," would also "partially offset some of the fuel cost savings from [the R]ule, limiting the magnitude of the impact on prices of final goods and services." ADD, 28.

However, EPA already factored, or did not factor, as the case may be, market failure and upfront vehicle costs into its own estimate of a 5 to 15 percent direct vehicle-miles-traveled rebound effect. All that Dr. Saunders did was to base his quantifying of the embedded energy indirect rebound effect on the bottom, 5 percent, end of EPA's own estimate of direct vehicle-miles-traveled rebound. See S.A. I, 249, ¶¶ 46, et seq. Since Dr. Saunders' quantifying of the embedded energy indirect rebound effect derives from EPA's lowest estimate of direct vehicle-miles-traveled rebound, EPA can fairly only subject Dr. Saunders's conclusion to outside variables

to the extent that it subjected its own estimate of direct vehicle-miles-traveled rebound to the same conditions.

Given the agencies' ignoring the reasoning of Dr. Saunders's analysis, it was easy for them to deny, as the National Highway Transportation Safety Administration did at ADD, 23, that the facts he points out would have led them to promulgate different standards. Because the two agencies failed to consider indirect embedded energy in their calculation of the rebound effect resulting from the Fuel Efficiency Standards, DOT failed to uphold its legal duty to consider "total overall energy consumption." 49 U.S.C. § 32902(k)(1)(C). Either agency's determination on remand, based on Dr. Saunders's analysis, that its previous estimates of "total overall energy consumption" were legally deficient would render EPA's reliance on such previous estimates irrational and therefore, require EPA revision of the GHG Emissions Standards. *Arkema*, 618 F.3d at 6. A remand to both agencies and vacatur is necessary.

Vacatur is similarly warranted since, as set forth above, EPA and DOT failed to consider POP Diesel's "specific challenges that are sufficiently central to [their] decision." *Int'l Fabricare Instit.*, 972 F.2d at 389.

- 52 -

## Case No. 11-1428

## I

## THE MOTIONS TO INTERVENE IN
## CASE NO. 11-1428 SHOULD BE DENIED

California Petitioners filed their petition for review of the Truck Rule on November 4, 2011. Ten days later, on November 14, 2011, four other petitions for review were filed. On November 17, 2011, this Court consolidated Case No. 11-1428 with those four cases. Thereafter, intervention motions in Case No. 11-1428 were filed by Government Movants and Environmental Group Movants. The Petitioners opposed the motions. The Court ordered that the intervention issues be decided by the Merits Panel.

The motions to intervene were filed on December 14, 2011. Both motions should be denied because they were filed nine days after the filing deadline, and the late filing was not, and cannot be, permitted or excused under applicable rules.

"No provision in the Federal Rules of Appellate Procedure provides for intervention on appeal, except in proceedings to review agency action [under Rule 15(d)]." *Amalgamated Transit Union Int'l, AFL-CIO v. Donavan*, 771 F.2d 1551, 1553 n.3 (D.C. Cir. 1985). Rule 15(d) states that, in cases where agency actions are challenged, "[a] motion [for leave to intervene] . . . must be filed within 30 days after the petition for review is filed." In turn, Fed. R. App. P. 26(a)(1) instructs:

>(1) *Period Stated in Days or Longer Unit.* When the period is stated in days or a longer unit of time: (A) exclude the day of the event that triggers the period; (B) count every day, including intermediate Saturdays, Sundays, and legal holidays; and (C) include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.

The petition for review in Case No. 11-1428 was filed on November 4, 2011. Thirty days after November 4, 2011, is December 5, 2011, which was not a Saturday, Sunday, or legal holiday. No motion to intervene was filed in Case No. 11-1428 before the expiration of the 30-day period. Rather, both of the intervention motions at issue here were filed on December 14, 2011, some 9 days after the expiration of the 30-day filing deadline.

The 30-day filing deadline is a hard-and-fast rule. *See, e.g., Ala. Mun. Distributors Group v. F.E.R.C.*, 300 F.3d 877, 879 (D.C. Cir. 2002) ("[A] motion for leave to intervene may be filed *up to* 30 days after the petition for review is filed . . . .") (emphasis added); *Illinois Bell Tel. Co. v. FCC*, 911 F.2d 776, 786 (D.C. Cir 1990) (concentrating on the language "*shall* be filed within 30 days of the date on which the petition for review is filed.") (emphasis added).

Circuit Rule 27(h) provides the only means by which a proposed intervenor may be excused from complying with the 30-day filing deadline:

>A motion to extend the time for filing motions . . . *must be filed at least 5 days before the pleading is due*. Motions filed less than 5 days before the due date *will be denied absent exceptional circumstances, except*

- 54 -

> *that the clerk may grant unopposed late filed motions for extension of*
> *time for good cause shown.*

(Emphasis added.)  In the instant case (1) neither of the two groups of movants filed for extension of time at least five days before the filing of the intervention motions, and (2) no exceptional circumstances have been alleged by the movants for their failure to comply with the five-day requirement.  Moreover, because the motions are opposed, the Clerk does not have the authority to grant an extension of time.   Thus, the movants failed to file within the 30-day filing deadline, and the failure cannot be excused.

The fact that this case was consolidated with other cases does not mean that the movants may file untimely intervention motions in this case.  Fed. R. App. P. 15(d) states that a motion to intervene "must be filed within 30 days after *the petition* for review is filed."  (Emphasis added.)  The Rule does not state that an intervention motion may be filed at any time within 30 days of the filing of *any* petition for review in consolidated cases.  And, the Rule does not state that an intervention motion may be filed at any time within 30 days of the *last* date upon which a petition for review *may* be filed.   Where controlling language is unambiguous, courts construe the language in accordance with its plain meaning.   *Chevron*, 467 U.S. at 842. Accordingly, the motions to intervene in Case No. 11-1428 should be denied.

## II

## EPA VIOLATED A STATUTORY MANDATE WHEN IT FAILED TO SUBMIT THE TRUCK RULE TO THE SCIENCE ADVISORY BOARD FOR PEER REVIEW

**A. Argument One:  EPA Violated a Nondiscretionary Statutory Mandate**

**1.  The Plain Language of the SAB Statute Required EPA to Submit the Truck Rule to the Science Advisory Board for Peer Review**

The SAB statute provides that

[for] *any* proposed criteria document, standard, limitation, or regulation, [EPA] . . . *shall* make available to the Board such proposed criteria document, standard, limitation, or regulation, together with relevant scientific and technical information in the possession of the Environmental Protection Agency on which the proposed action is based.

42 U.S.C. § 4365(c)(2) (emphasis added.).  The use of the word "shall" signifies that submittal of proposed regulatory actions to the SAB is nondiscretionary.  *Am. Petroleum Inst. v. Costle,* 665 F.2d 1176, 1188 (D.C. Cir. 1981) ("The language of the statute indicates that making a [regulatory proposal] available to the SAB for comment is mandatory . . . .").

In an analogous context, the Supreme Court determined that Congress' use of the word "shall" in the Clean Water Act imposed a mandatory, nondiscretionary duty. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661 (2007), *citing Lopez v. Davis,* 531 U.S. 230, 241 (2001).  In *Lopez*, The Supreme Court noted

- 56 -

the significance of the fact that Congress, in the same statute, used "may" and "shall" to denote different obligations, such that "may" creates discretionary obligations, while "shall" creates nondiscretionary obligations. The same is true in the instant case, because 42 U.S.C. § 4365(c)(1) mandates that EPA "shall" submit the material to the SAB for review, but then in the very next paragraph 42 U.S.C. § 4365(c)(2) provides that the SAB "may" give its advice and comments on the material submitted to it. Accordingly, the mandatory nature of EPA's submittal duty is clear. *Moskal v. United States*, 498 U.S. 103, 109 (1990) (courts must give effect to every clause and word of a statute.); *Bennett v. Spear*, 520 U.S. at 172 (describing the "rudimentary" principle of administrative law that regulatory action must comply with statutory requirements.). *See Chevron*, 467 U.S. at 842-43 (courts and agencies " must give effect to the unambiguously expressed intent of Congress.").

The plain meaning of the mandatory SAB submittal requirement is confirmed by its purpose, which is to provide the SAB an opportunity to make available "its advice and comments [to EPA] on the adequacy of the scientific and technical basis of the [regulatory proposals]." 42 U.S.C. § 4365(c)(2). SAB's mission is to provide "expert and independent advice to the [EPA] on the scientific and technical issues facing the Agency" and to assist EPA "in identifying emerging environmental problems." 40 C.F.R. § 1.25(c). *See*, Joe G. Conley, *Conflict of Interest and the EPA's Science Advisory Board*, 86 Tex. L. Rev. 165, 168 (2007) ("Congress

- 57 -

established the EPA Science Advisory Board in 1978 to provide independent
scientific and technical advice to EPA.").  A key element of the SAB's mission is to
render advice to EPA "on a wide range of environmental issues and the integrity of
the EPA's research."  *Meyerhoff v. United States EPA*, 958 F.2d 1498, 1499 (9th Cir.
1992).

The legislative history further illustrates Congress' intent.  *See,* Joint
Explanatory Statement, H.R. Conf. Rep. 96-722, 3296 (1977) ("The first paragraph
of this section *requires* the Administrator of EPA to make available to the [Science
Advisory] Board any proposed criteria document, standard, limitation, or regulation
together with scientific background information in the possession of the Agency on
which the proposed action is based.") (emphasis added).  *See Chevron*, 467 U.S. at
845 (agency interpretation of a statute is impermissible if it "is not one that Congress
would have sanctioned.").

## a.  The Truck Rule Is Both a "Standard" and a "Regulation"

Proposed EPA "standards" and "regulations" must be submitted to the SAB for
peer review.  42 U.S.C. § 4365(c)(2); *see API*, 665 F.2d at 1188.  The Truck Rule is
both a "standard" and a "regulation."  It is a "standard" promulgated by EPA under
42 U.S.C. § 7521(a) ("[EPA] shall . . . prescribe . . . *standards* applicable to the
emission of any air pollutant from . . . new motor vehicles . . . which . . . cause, or
contribute to, air pollution which may reasonably be anticipated to endanger public

health or welfare . . . .") (emphasis added). In its preamble to the final regulations, EPA refers to the proposed regulations as "carbon dioxide (CO2) emissions *standards*." 76 Fed. Reg. at 57,106 (emphasis added), and acknowledges that the standards were promulgated under 42 U.S.C. § 7521(a). *See* 76 Fed. Reg. at 57,129 n.44.

The Truck Rule is a "regulation" because it has the force of law. A regulation, also known as a legislative rule, is "an agency statement of general or particular applicability and future effect designed to . . . prescribe law or policy." 5 U.S.C. § 551(4). *Thomas v. New York*, 802 F.2d 1443, 1445-47 (D.C. Cir. 1986), cert. denied, 482 U.S. 919 (1987). Here, the Truck Rule is "generally applicable" to manufacturers, distributors, and users of heavy and medium duty engines and vehicles and prescribes enforceable legal requirements on them, thereby constituting legally binding regulations.

### b. EPA Provided the Truck Rule to "Other" Federal Agencies for Formal Review and Comment Before it Was Promulgated

The mandatory duty to make available a proposed standard or regulation to the SAB for peer review arises when it "is provided to any other Federal agency for formal review and comment. . . ." 42 U.S.C. § 4365(c)(1). EPA acknowledged in the preamble to the final Truck Rule that it had submitted the rule to the Office of Management and Budget for review:

> Under section 3(f)(1) of Executive Order 12866 (58 FR 51735, October 4, 1993), this action is an ''economically significant regulatory action'' because it is likely to have an annual effect on the economy of $100 million or more. Accordingly, the agencies submitted this action to the Office of Management and Budget (OMB) for review under Executive Order 12866 and any changes made in response to OMB recommendations have been documented in the docket for this action.

76 Fed. Reg. at 57,364.

The Executive Order cited in the text is in the Addendum (Appendix A). In relevant part the Executive Order states

> Coordinated review of agency rulemaking is necessary to ensure that regulations are consistent with applicable law, the President's priorities, and the principles set forth in this Executive Order, and that decisions made by one agency do not conflict with the policies or actions taken or planned by another agency. The Office of Management and Budget (OMB) shall carry out that review function.

58 Fed. Reg. 51,735 (Sept. 30, 1993); Appendix A-4.

Thus, regulatory proposals having "economically significant" impacts must go through a "coordinated review" overseen by the OMB. The review requires OMB to ensure consistency and priorities and avoid conflicts among federal agencies. Indeed, the Executive Order specifies in painstaking detail exactly what must be submitted to OMB for review, and prescribes an elaborate "regulatory plan" that must consist of each significant regulatory action, including anticipated costs and benefits, a summary of the legal basis for each action, the agency's schedule for action, and other data. *Id.* at Section 4(c)(1) (A) - (F), Appendix A-5 to A-6. Significantly, within 10

- 60 -

days after OMB receives the regulatory plan from EPA, it must circulate it to "other federal agencies" and to "the Vice President," to check for possible conflicts among agencies, and all must follow and document their compliance with a detailed procedure set forth in the executive order for resolving conflicts. *Id.* at Section 4(c)(3) - (7), Appendix A -6. A more "formal" review process is difficult to imagine. Accordingly, EPA Made available the proposed Truck Rule to another federal agency, namely, OMB, pursuant to Executive Order 12866, and through OMB, to other federal agencies, including the Vice President, bringing the review of the Truck Rule squarely within the ambit of "formal" federal agency review under 42 U.S.C. § 4365(c)(1).

Moreover, the preamble to the final rule states that, pursuant to the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq., and its implementing regulations, copies of the draft environmental impact statement were mailed to interested parties, "including federal, state, and local agencies," and EPA held two hearing on the EIS, 76 Fed. Reg. at 57,365. After receiving and responding to over 3,000 comments, a final EIS was prepared and published. *Id.* at 57,365-57,366. Surely seeking review of a draft environmental impact statement under NEPA from other federal agencies also qualified as "formal" review by federal agencies pursuant to 42 U.S.C. § 4365(c)(1).

- 61 -

### c. The Truck Rule Was Never "Made Available" to the Science Advisory Board for Peer Review

This Court has ruled that "making available" a regulatory proposal to the SAB for peer review requires that EPA 'submit" the proposed regulation to the SAB. *API*, 665 F.2d at 1189 ('the statute explicitly mandates that standards be *submitted* to the Board for review.") (emphasis added). In response to comments on the proposed rule offered by the Petitioners, located in the Addendum (Appendix C), EPA opined that, although it did not actively "submit" the Truck Rule to the SAB for review, the relevant documents were " accessible and obtainable" by the SAB:

> EPA made the proposed rule and underlying support documents accessible and obtainable by publication of the proposed rule in the Federal Register, and by posting all of the scientific and technical support documents on the web. EPA is aware that the D.C. Circuit, in holding that EPA had not made available a proposed regulation to the SAB stated that EPA had not "submitted" the proposed regulation to the Board. This case, however, antedated the present period of instantaneous availability of documents via electronic dissemination. EPA believes that by publishing and posting the proposed regulation and the scientific and technical support documents those materials have been made available to the SAB.

EPA Response to Comments Document for Joint Rulemaking, August 2011 at 5-41-42 (citations omitted). Appendix D-8 to D-9. EPA's belief that it can ignore judicial precedent, thereby disregarding the fundamental constitutional principle of separation of powers, is remarkable. Contrary to this Court's decision in *API*, EPA would place the onus on SAB to chase after EPA's proposed rules rather than placing the onus on

- 62 -

EPA to submit them to the SAB. *API*, 665 F. 2d at 1189. EPA's interpretation cannot trump this Court's ruling that Congress intended to place the onus on EPA. *Chevron*, 467 U.S. at 845 (agency interpretation of a statute is impermissible if it "is not one that Congress would have sanctioned.").

In effect, EPA's interpretation rewrites the SAB statute in conformance with its administrative predilections, something EPA is not permitted to do. *Food and Drug Admin. v. Brown & Williamson*, 529 U.S. 120, 125 (2000) ("Regardless of how serious the problem an administrative agency seeks to address . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'"), (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988)). Given the fact that Congress placed the burden on EPA to make regulatory proposals available to the SAB, EPA's position that SAB members should be required to track down EPA's regulatory proposals is untenable. *See, U.S. v. Kirby*, 74 U.S. 482, 486 (1868) ("[a]ll laws should receive a sensible construction.").

Allowing EPA to thwart Congress' will in the way EPA suggests would provide EPA with a license to ignore a rulemaking requirement mandated by statute. Such a license may not be granted by a court to an administrative agency. *Bennett v. Spear*, 520 U.S. at 172.

## 2. The Science Advisory Board Peer Review Mandate Is Not Subject to the Judicial Review Constraints on EPA's Violations of Clean Air Act Procedural Requirements

The SAB submittal requirement applies not only to EPA's regulatory proposals under the Clean Air Act but to regulatory proposals made under every "authority of the Administrator."  42 U.S.C. § 4365(c)(1).  Under principles established by the Supreme Court, the statutory authorities administered by EPA must be construed in a way that makes them consistent with each other, if at all possible.  *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 524 (1986) (differing statutes should be interpreted so as to be consistent).

Crucially, the SAB statute contains no limitations on judicial review of the SAB submittal requirement.  At the same time, the CAA places limitations only on judicial review of rulemaking procedures mandated by the CAA itself.  *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 522 (D.C. Cir 1983) (in amending the CAA in 1977, Congress "wanted to add *new* procedural protections" in the CAA while "[minimizing] disputes over EPA's compliance with the *new* procedures" in that Act,  and Congress "did not intend to cut back" on statutory procedural protections set forth in statutes other than the CAA).  Thus, the "substantial likelihood" standard set forth in the CAA for procedural violations of that Act, 42 U.S.C. § 7607(d)(8), does not apply to violations of rulemaking procedures mandated by statutes *other than* the CAA, such as the SAB statute.  *Small*

*Refiner*, 705 F.2d at 522-24.

Under the overarching rule enunciated by the Supreme Court in *Parsons Steel*, EPA must comply with the SAB submittal requirement consistently for all of its regulatory proposals, regardless of the specific law under which a particular proposal may arise. *Parsons Steel* requires this result because the SAB submittal requirement does not distinguish among EPA's substantive regulatory authorities but applies equally to all of them. So too, differing standards of judicial review are not sanctioned by the SAB statute.

This Court's 1981 decision in *API* applied the CAA's "substantial likelihood" test without analyzing whether another standard was more appropriate. But the 1986 Supreme Court decision in *Parsons Steel* requires this Court to apply a uniform test for SAB submittal violations, regardless of whether the underlying regulation was promulgated under the CAA or "any other authority of the Administrator." 42 U.S.C. § 4365(c)(1). Of course, the CAA's "substantial likelihood" standard cannot apply to violations of the SAB submittal requirement in connection with rules promulgated by EPA under any statutory authority other than the CAA because no other EPA-administered statute authorized the "substantial likelihood" test under any circumstance.

Citing *API*, this Court's decision in *Coalition for Responsible Regulation v. EPA*, 684 F.3d 102 (D.C. Cir. 2012), applied the "substantial likelihood" test to the

SAB submittal requirement in the context of a CAA regulation, again without analyzing whether another test, *i.e.,* one which could be applied to rulemaking under any EPA-administered statute, was more appropriate. The *Coalition for Responsible Regulation* opinion failed to recognize the conflict between *API* and *Parsons Steel*, and mistakenly applied *API's* "substantial likelihood" test to SAB review. Accordingly, *Coalition for Responsible Regulation* also conflicts with the Supreme Court's 1986 decision in *Parsons Steel* and must also yield to *Parsons Steel* on this issue.

The legislative history of the CAA confirms this result. The report of the Standing House Committee on Interstate and Foreign Commerce (the "Committee"), which investigated the need for and crafted the language of the judicial review provisions of the CAA's 1977 amendments, is particularly instructive. *See* Norman J. Singer, *2A Sutherland Statutes and Statutory Construction* § 48:6 (7th ed. 2007) ("The report of the standing committee in each house of the legislature which investigated the desirability of the statute under consideration is often used as a source for determining the intent of the legislature."). The Committee noted that the pre-1977 CAA lacked sufficient "procedural safeguards" and that

> [B]road administrative discretion to promulgate regulations to protect health or the environment must be restrained by thorough and careful procedural safeguards that insure an effective opportunity for public participation in the rulemaking process.

- 66 -

H. Rep. 95-294 at 319 (May 12, 1977).   Among other things, the Committee concluded that there was a need for clearly defined procedures applicable to establishing a publicly available record as a basis for decisionmaking under the CAA. *Id.* at 320.   Of special concern to the Committee were the "new" procedural requirements for cross-examination of witnesses on disputed factual issues, which were added by the 1977 CAA Amendments in connection with hearings held on rulemaking proposals.   To prevent the new procedures from getting bogged down in fine points such as

> [Whether] a given question involves 'facts' or 'policy' or whether a given fact is 'legislative' or 'adjudicative,'. . . the committee has limited the extent to which the Administrator's decisions on *such* procedural matters may be reversed during judicial review.

*Id.* at 322. (Emphasis added).   The Committee went on to state that courts may overturn EPA rulemaking under the CAA with regard to

> [*S*]*uch* procedural matters [only if] the procedural errors 'were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.'

*Id*. (Emphasis added).   Thus, the only procedural violations subject to the high bar set by Congress are the "new" rulemaking procedures established by Congress in the 1977 CAA Amendments.  *See, Small Refiner,* 705 F.2d at 522.   EPA's adherence to the rulemaking procedures mandated in the CAA is not at issue in this case.   Here, EPA utterly failed to comply with the nondiscretionary requirement to submit the

Truck Rule to SAB for external peer review before it was promulgated. That failure is a violation of the SAB statute and not the CAA. Accordingly, EPA's failure is not subject to the "substantial likelihood" standard for procedural violations of the CAA. *Id.*

### 3. EPA's Failure to Submit the Regulation to the Science Advisory Board Was Not Harmless

EPA's failure to submit the proposed Truck Rule and supporting material to the SAB at any stage distinguishes this case from an earlier case where a failure was found by this Court to be harmless. In *API*, procedural challenges were raised against the ozone standards established by EPA. In that case, EPA submitted two drafts of the criteria documents to the SAB and made changes to the criteria documents based on the SAB's recommendations. *See*, 665 F.2d at 1188. The proposed ozone standard, which was based upon the previously submitted criteria documents, was not submitted to the SAB. In rejecting the challenge, this Court found that because the SAB had twice reviewed the criteria, which contained the scientific and technical basis for the standard, it was unlikely that review of the actual standard would have mattered. *Id.* at 1189. In the instant case, however, the SAB never had the opportunity to review anything. Allowing EPA to disregard the statutory mandate in such a careless manner would send a message to EPA that it can bypass the SAB at will in connection with any rule it promulgates under the CAA. EPA should be made

keenly aware that it is required to comply with nondiscretionary statutory mandates, as every other administrative agency must do.

Furthermore, the impact of EPA's error has grave consequences on the truck industry, especially small trucking firms such as the members of Petitioner CCTA. The Truck Rule covers all new heavy-duty trucks starting with the 2014 model year and imposes stringent new fuel consumption standards. 76 Fed. Reg. at 57,106. In order to reduce greenhouse gas emissions, EPA determined that the Truck Rule should include fundamental changes not only to truck engines but to the entire truck. As EPA stated:

> For this first rulemaking, the agencies proposed a complementary engine and vehicle approach in order to achieve the maximum feasible near-term reductions.

76 Fed. Reg. at 57,114. This results in an enormous increase in the cost of trucks. Lee Brown Decl. ¶¶ 6-7, Appendix B-3. 76 Fed. Reg. at 57,321. EPA acknowledges that "these costs would presumably have some impact on new truck prices," but elected to "make no attempt at determining what the impact of increased costs would be on new truck prices." *Id.* at 57,321. The costs will be passed on to purchasers of new trucks, including the members of CCTA. Lee Brown Decl. ¶¶ 6-7, Appendix B-3.

Collectively, Petitioner CCTA's membership owns or leases at least 5,000 heavy duty trucks, primarily based in California. CCTA's members' primary source

of livelihood are their trucks, typically costing at least $150,000. Lee Brown Decl. ¶ 4, Appendix B-2. The Truck Rule will increase such costs dramatically, while few CCTA members have the capital or the credit to invest in the expensive new trucks, resulting in business closings or layoffs. Lee Brown Decl. ¶¶ 7-8, Appendix B-3. The same applies to other Petitioners. Klenske Decl. ¶¶ 5-10, Appendix B-17 to B-18; Norman Brown Decl. ¶¶ 9-11, Appendix B-7. For these additional reasons, any notion that EPA's failure to submit the Truck Rule to the SAB for external peer review was "harmless" is belied by the facts.

**B. In the Alternative, Argument Two: EPA's Failure to Submit the Truck Rule to the Science Advisory Board Was So Serious and Related to Matters of Such Central Relevance That There is a Substantial Likelihood the Rule Would Have Been Significantly Changed by EPA If Peer Review Had Been Sought.**

Assuming *arguendo* that the CAA's "substantial likelihood" judicial review standard applies in the instant case, the Truck Rule still must fail. The plain language of the SAB statute requires that EPA submit its regulatory proposals to the SAB for peer review before they are promulgated. 42 U.S.C. § 4365(c)(1). And, the legislative history makes clear that the SAB's role in EPA's rulemaking process is to "be able to preview conflicting claims and advise the [EPA] on the adequacy and reliability of the technical basis for rules and regulations." Joint Explanatory Statement, H.R. Conf. Rep. 96-722, 3295-96. Congress' Joint Explanatory Statement

goes on to state:

> Much of the criticism of the Environmental Protection Agency might be avoided if the decisions of the Administrator were fully supported by technical information which had been reviewed by independent, competent scientific authorities.

> . . . [T]he intent of [the SAB submittal requirement] is to ensure that the [SAB] is able to comment in a well-informed manner on any regulation that it so desire.

*Id.* at 3296.

Thus, congressional contemplation of a "substantial likelihood that EPA's regulatory proposals would undergo "significant change" as a result of SAB review is built into the fabric of the SAB statute, and that is why SAB submittal is "mandatory." *API*, 665 F.2d at 1188. "[Courts] must reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n.9. Accordingly, even under the CAA's "significant likelihood" standard, the uncertainty created by EPA's failure to submit the Truck Rule to the SAB for peer review indicates a "significant likelihood" that the rule would have been "substantially changed" if such errors had not been made. 42 U.S.C. § 7607(d)(8).

Such a result is compelled by *Kennecott Corp. v. EPA*, 684 F.2d 1007 (D.C. Cir. 1982). In *Kennecott*, EPA denied an administrative petition for reconsideration by asserting that its failure to include certain documents in the rulemaking record was not significant because, even if the documents had been included, EPA would have

come to the same regulatory conclusion. This Court disagreed, stating that the "absence of those documents . . . makes impossible any meaningful comment on the merits of EPA's assertions." *Id.* at 1018. "EPA's failure to include such documents constitutes reversible error, for the uncertainty that might be clarified by those documents . . . indicates a 'substantial likelihood' that the regulation would 'have been significantly changed.'" *Id.* at 1018-19. Here, EPA's failure to make the proposed Truck Rule available to the SAB for peer review also is reversible error because the uncertainty regarding the outcome of SAB's review and EPA's response indicates a substantial likelihood that the regulation would have been significantly changed had SAB been consulted.

This conclusion is supported by the attached declaration of Roger O. McClellan, who served as a member of the SAB for over three decades, including years as a member of its Executive Committee and as Chairman of SAB's Clean Air Scientific Advisory Committee. McClellan Decl. ¶¶ 2-3, California Petitioners' Appendix B-10 to B-11. Mr. McClellan states that "[t]he SAB serves a critical gatekeeper role whose mission is to ensure that EPA's regulatory proposals are based upon sound scientific and technical principles." McClellan Decl. ¶ 11, Appendix B-14. He states further that EPA has often "changed its regulatory proposals based on review and comment by the SAB, and this has been the rule rather than the exception, which stands to reason, as the SAB was created to provide an expert reality

check for EPA scientific and technical determinations that inform policy judgments."

McClellan Decl. ¶ 10, Appendix B-14.  Mr. McClellan concludes:

> I believe that EPA made a serious error in failing to submit the Truck Rule and the science upon which it is based to the SAB for peer review before promulgation.  In my opinion, this error was so serious and related to matters of such central relevance to the Truck Rule that there is a substantial likelihood that the rule would have been significantly changed in response to advice from the SAB had it been made available to the SAB by EPA for review prior to its  promulgation.

McClellan Decl. ¶12, Appendix B-15.

Because the purpose of the SAB submittal requirement is to provide the SAB an opportunity to make available "its advice and comments [to EPA] on the adequacy of the scientific and technical basis of [regulatory proposals]," 42 U.S.C. § 4365(c)(2), Congress could not have contemplated that SAB review would be no more than a mere formality or a superfluous gesture. *Moskal*, 498 U.S. at 109 (Courts should give effect to every clause and word of a statute.).  In fact, Congress contemplated that EPA's proposed CAA regulations would significantly evolve, mature, and otherwise change as a result of SAB's scientific and technical advice. Lynne E. Dwyer, *Good Science in the Public Interest:  A Neutral Source or Friendly Facts?* 71 Hastings College of Law West - Northwest Journal of Environmental Law & Policy, 3, 6-7 (2000) (creation of SAB intended by Congress to lead to better rulemaking).  *See* McClellan Decl. ¶¶ 10-12.  Accordingly, assuming *arguendo* the applicability of the stringent review standard for violations of procedural violations

- 73 -

of the CAA itself, as set forth in 42 U.S.C. § 7607(d)(8), the Truck Rule should be vacated and remanded to EPA under the "substantial likelihood" test.

In its response to comments filed by the Petitioners on the proposed Truck Rule, EPA claimed that the Petitioners failed to properly raise this issue during the public comment period. EPA Response to Comments Document for Joint Rulemaking, August 2011 at 5-42, Appendix D-9. That is untrue. The Petitioners' comment letter squarely raised the SAB issue and cited the following language from *Kennecott*:

> In all circumstances, EPA's failure to include such documents . . . constitutes reversible error, for the *uncertainty* that might be clarified by those documents . . . indicates a 'substantial likelihood' that the regulations would 'have been significantly changed.

(citing 684 F.2d at 1018-19) (emphasis added). *See*, California Petitioners' Appendix C-10. Under the circumstances, it is unbelievable that EPA was not alerted to the Petitioners' concerns. The purpose of the notice requirement is to alert the agency of the objection so that the agency may correct the error before promulgating the proposed rule. *See, Appalachian Power Co. v. EPA*, 251 F.3d 1026 (D.C. Cir. 2001) (only "reasonable specificity" required "to alert the agency.") Certainly that threshold is crossed when a commenter points out that the agency has failed to comply with a statutory duty that could lead to reversal of the agency action. *Tex Tin Corp. v. EPA*, 935 F.2d 1321, 1323 (D.C. Cir. 1991) (objections require only "sufficient specificity

to reasonably alert the agency."). Significantly, the legislative history shows that Congress intended 42 U.S.C. § 7607(d)(7)(b) to function essentially as a heads-up mechanism for EPA to "be given an opportunity to pass on the significance of the materials" submitted during the comment period. Committee Report, H.R. 95-294 at 323. Congress could not have intended to provide EPA with an excuse to claim that it had been blind-sided, where, as here, EPA was aware of the nature and potential legal consequences of the Petitioners comments. *Kirby*, 74 U.S. at 486 ("[a]ll laws should receive a sensible construction.").

**C. The Decision in *Coalition for Responsible Regulation, et al., v. Environmental Protection Agency* Regarding the Endangerment Finding Does Not Constrain this Court from Ruling in Favor of the Petitioners in Connection with this Challenge to the Truck Rule**

The Petitioners are mindful of this Court's decision in *Coalition for Responsible Regulation v. Environmental Protection Agency*, 684 F.3d 102 (D.C. Cir. 2012), where dozens of petitioners challenged EPA's finding that greenhouse gas emissions from mobile sources pose a danger to human health and welfare. One of the challenges was based on EPA's failure to submit the endangerment finding to the SAB for peer review. The panel in the case concluded that EPA did not violate the SAB submittal requirement in connection with the endangerment finding because (1) it was "not clear" whether the finding was submitted "to any other Federal agency for formal review and comment," thereby triggering the SAB submittal duty, 684 F.3d

at 124, and (2) "even if EPA violated its mandate by failing to submit the Endangerment Finding to the SAB, Industry Petitioners have not shown that this error was 'of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.'" 684 F.3d at 124.

For three reasons, the decision in *Coalition for Responsible Regulation* regarding the endangerment finding does not constrain this Court from ruling in favor of the Petitioners in connection with the Truck Rule. First, although it may not have been clear in *Coalition for Responsible Regulation* whether EPA sought "formal review and comment" of the endangerment finding from another federal agency, it is abundantly clear that EPA did seek formal review and comment of the Truck Rule from the Office of Management and Budget pursuant to Executive Order 12866, as well as from other federal agencies under NEPA, thereby triggering the SAB submittal requirement under 42 U.S.C. § 4365(c)(1).

Second, the Court in *Coalition for Responsible Regulation* did not categorically decide whether the SAB submittal requirement is subject to the judicial review constraints applicable to procedural violations of the CAA. *See Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 170 (2004) (a court's silence regarding issues does not constitute precedent). Accordingly, *Coalition for Responsible Regulation* is not precedent on the issue of whether the limitations on judicial review

- 76 -

of procedural violations of the CAA categorically apply to EPA's failure to submit a proposed CAA rule for peer review under the separate SAB statute. Moreover, as indicated, although *Coalition for Responsible Regulation* cited *API* approvingly for the "substantial evidence" test, it did not address the issue of whether the Supreme Court's decision in *Parsons Steel* superceded this Court's *API* decision regarding the standard of judicial review for violations of the SAB submittal requirement. That issue is raised squarely here.

Third, assuming *arguendo* that the limitations on judicial review of procedural violations under the CAA apply also to the SAB submittal requirement, for the reasons set forth in Section II.B., *supra*, the Petitioners have shown that EPA's failure to submit the Truck Rule to SAB for review and comment was "of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if [the error] had not been made." 684 F.3d at 124, citing 42 U.S.C. § 7607(d)(8). *See* McClernon Decl. ¶ 12, Appendix B-15.

### III

### THE TRUCK RULE SHOULD BE
### REMANDED AND VACATED

Invalid rules are ordinarily remanded and vacated. *Federal Power Commission v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976). An agency's "utter failure" to comply with a rulemaking requirement usually requires vacature. *Sugar Cane Growers Co-op of Florida v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002). ("Normally, when an agency so clearly violates the APA we would vacate its action."). Here, there was an utter failure by EPA to comply with the rulemaking requirements of the SAB statute, a situation that calls for both remand and vacatur. *Sprint Corp. v. Fed. Commc'n Comm'n*, 315 F.3d 369 (D.C. Cir. 2003) (vacatur complements remand with regularity when notice-and-comment is absent).

Vacatur is not mandatory in every case. "[T]he decision whether to vacate depends on the seriousness of the deficiencies and the disruptive consequences of an interim change that may itself be changed." *Sugar Cane Growers*, 289 F.3d at 98. Moreover, when petitioners would be harmed if an EPA rule were remanded but not vacated, this Court has chosen to vacate the rule. *Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 872 (D.C. Cir. 2001).

Here, the Petitioners have shown that they will be severely harmed if the Truck Rule is not vacated. See, e.g., Norman Brown Decl. ¶ 11, Appendix B-7 ("If the

Truck Rule were to be vacated, Delta would no longer be injured by the cost increases attributable to the Truck Rule, and would no longer suffer the economic losses caused by the Truck Rule."); Lee Brown Decl. ¶ 10, Appendix B-4 (same).

Furthermore, EPA's utter failure to comply with the SAB submittal requirement evidences the seriousness of the deficiency in this case. Moreover, an SAB veteran of over thirty years has opined that the Truck Rule likely would be significantly changed if SAB were given the opportunity to review it. McClellan Decl. ¶ 12, Appendix B-15. At the same time, the potential disruptive consequences of vacatur here are minimal, because the first phase of the rule begins to apply only in model year 2014, while subsequent phases do not apply until 2016 or 2017. *See*, 76 Fed. Reg. at 57,134.

## CONCLUSION

For the foregoing reasons, the Court should remand and vacate the Truck Rule.

DATED: July 22, 2014.

Respectfully submitted,

CLAUDE D. CONVISSER

 /s/ *Claude D. Convisser*

CLAUDE D. CONVISSER
D.C. Circuit Bar No. 47851
Plant Oil Powered Diesel Fuel
Systems, Inc.
P.O. Box 6397
Santa Fe, New Mexico 87502
505-310-3840
cdc@popdiesel.com

Counsel for Petitioner Plant Oil
Powered Diesel Fuel Systems, Inc.

THEODORE HADZI-ANTICH
D.C. Circuit Bar No. 53056
Pacific Legal Foundation
930 G Street
Sacramento, CA 95814
916-419-7111
tha@pacificlegal.org

Counsel for Delta Construction
Company, Inc., et al.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMITATION, TYPEFACE
REQUIREMENTS, AND TYPE STYLE REQUIREMENTS.

1.    This Corrected Joint Opening Brief of Petitioners Delta Construction Company, Inc., et al., and Plant Oil Powered Diesel Fuel Systems, Inc., complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

  ✓   It contains 17,995 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(b)(iii) and D.C. Cir. R. 32(a)(1), or

  ___   It uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This Corrected Joint Opening Brief of Petitioners Delta Construction Company, Inc., et al., and Plant Oil Powered Diesel Fuel Systems, Inc., complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

  ✓   It has been prepared in a proportionally spaced typeface using WordPerfect X5 in font style Times New Roman and font size 14, or

  ___   It has been prepared in a monospaced typeface using WordPerfect X5 with ____ characters per inch and type style _____.

DATED: July 22, 2014.


  /s/ *Claude D. Convisser*_____
Attorney for Petitioner Plant Oil
Powered Diesel Fuel Systems, Inc.


_____
Attorney for Petitioners Delta
Construction Company, Inc., et al.

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

 /s/ *Claude D. Convisser*
CLAUDE D. CONVISSER

**PETITIONER PLANT OIL POWERED DIESEL FUEL SYSTEMS, INC.'S**

**SUPPLEMENTAL ADDENDUM REGARDING STANDING**

## DECLARATION OF CLAUDE D. CONVISSER

I, Claude D. Convisser, declare under penalty of perjury that the following is true:

1.    Here is a rough outline of the paragraphs of this Declaration:

- Paragraph 2 summarizes the declarant's qualifications to state the facts and opinions herein.

- Paragraphs 3 to 5 describe the federal statutory and regulatory framework that POP Diesel's engine equipment is subject to, including the Truck Rule.

- Paragraphs 6 to 10 explain how the Tailpipe Rule's measure of fuel efficiency and greenhouse gases exclusively by carbon coming emitting from a truck's tailpipe perversely penalizes POP Diesel's 100% plant oil fuel and engines that enable this fuel's use.

- Paragraph 11 states POP Diesel's reason for not having filed this declaration with along with the petitioners' original Joint Opening Brief.

- Paragraphs 12 to 16 explain POP Diesel's position within the engine industry and the harm the Company suffers from not receiving any recognition under the Truck Rule for its greenhouse gas-mitigating products.

- Paragraph 16 explains why POP Diesel is still subject to and regulated by the Truck Rule, no matter how few engines the Company retrofits.

- Paragraph 17 summarizes, in conclusion, the injury to POP Diesel from the

Truck Rule, which this challenge to it seeks to redress.

2.    I have been since October 2007, the General Counsel, and since early 2008, the Chairman of the Board of Directors and President of Plant Oil Powered Diesel Fuel Systems, Inc. ("POP Diesel). POP Diesel is a pioneering engine equipment and biofuel company, which was the first to receive approval (in 2013) by the U.S. Environmental Protection Agency and the National Highway Transportation Safety Administration to use 100% vegetable oil in select diesel engines, in POP Diesel's case, 100% jatropha plant oil in diesel engines that have POP Diesel's patented enabling equipment installed on them. Holding these positions, I am in charge of, and have eight years' experience in, the following areas of responsibility for POP Diesel, among others: regulatory compliance; corporate and legal strategy; interactions with the engine and fuel industries, including business development opportunities; interactions with EPA, the Administration, and Congress; and raising investment and securing other funding sources. In addition, I have served since 2010 as POP Diesel's representative to ASTM International's Petroleum Products Committee, which establishes fuel quality standards that most states automatically incorporate into their law. To be able to advance POP Diesel's interests in this forum and due to POP Diesel's pioneering work with using 100% vegetable oil as diesel engine fuel, I have had to acquire unique and intimate knowledge of the physical and chemical properties

- 85 -

and behavior in diesel engines of 100% plant oil fuel.

3.    POP Diesel is a manufacturer of engine equipment regulated by EPA under the federal Clean Air Act ("CAA") and by the U.S. Department of Transportation ("DOT") and its National Highway Transportation Safety Administration under fuel efficiency law and other federal statutes.  For POP Diesel to supply 100% plant oil fuel to a fuel customer in the marketplace, the fuel system of the customer's diesel engine must have special enabling equipment, POP Diesel's patented auxiliary fuel system, be installed on it.  However, before POP Diesel can engage in the commercial sale of its enabling auxiliary Fuel System to any customer, EPA requires that POP Diesel conduct and pass Clean Air Act compliance emissions testing.  If POP Diesel did not conduct and pass such emissions testing to EPA's satisfaction on new or existing engines prior to installing its enabling equipment onto a particular engine's fuel system for commercial sale, POP Diesel would be committing a prohibited act under the Clean Air Act.  EPA would then have grounds to prosecute POP Diesel for failure to obtain a certificate of conformity from EPA on a new engine under CAA section 203(a)(1) (codified at 42 U.S.C. § 7522(a)(1)) or for unlawful tampering with an existing engine's emissions equipment under CAA section 203(a)(3) (codified at 42 U.S.C. § 7522(a)(3)).  Under these circumstances, EPA could fine POP Diesel $25,000 per day per non-conforming engine unit.  CAA section 205(a)

(codified at 42 U.S.C. § 7524(a)(1)).  The afore-mentioned statutory sections are appended to this declaration on the pages following my signature block.

4.    The threat of EPA fines under the Clean Air Act is real, if POP Diesel fails to secure EPA approval before installing its 100% plant oil enabling equipment onto any kind of diesel engine for which POP Diesel has not previously received EPA approval.  The very day after POP Diesel secured its first EPA approval on select diesel engines in July 2013, Steve DeBord, who was then the heavy duty engine Compliance Officer in EPA's Office of Transportation and Air Quality, called me on the telephone and told me that if POP Diesel so much as turned a wrench on another kind of diesel engine without first securing EPA's advance approval for a test plan under the Clean Air Act, POP Diesel would be subject to fines of $25,000 per engine per day.

5.    Although the Truck Rule deals with new engines and trucks, even if POP Diesel sticks only to retrofitting existing engines, rather than having its enabling equipment installed from the engine manufacturer's factory onto new engines, POP Diesel is subject to the fuel efficiency and emissions requirements set forth in the Truck Rule's regulations for the retrofitting of its enabling equipment after-market on new engines or engines subject to the Truck Rule as they age in future years.

6.    The Truck Rule, of course, centers on the Tailpipe Rule's measure of

fuel consumption and efficiency and greenhouse gas emissions according to the amount of carbon emitted from the motor vehicle tailpipe, which I address next in this Declaration. However, an understanding of some of the combustion properties of plant oil in diesel engines is necessary, as background information.

7.      100% plant oil consists of triglyceride molecules, which are three fatty acid chains bound together along a hydrocarbon axis. Each fatty acid chain contains one or more atoms of oxygen. The presence of these oxygen atoms, which are not present in petroleum diesel hydrocarbon molecules, means that the combustion of the plant oil hydrocarbon requires more fuel in mass or volume to perform the same amount of work as petroleum hydrocarbon. It is the hydrogen and carbon atoms, joined together, that actually produce and release energy when combusted; the oxygen atoms, absent from non-oxygenated petroleum hydrocarbon, take up space in the plant oil molecule, combine with carbon in producing emissions, and do not add or release as much energy as the pure hydrocarbon bond does during combustion. In terms of emissions, this means that the combustion of 100% plant oil produces more carbon dioxide out the tailpipe per unit of fuel burned or work performed for a particular mass or volume unit of fuel input, as compared with petroleum hydrocarbon / petroleum diesel fuel.

8.      Thus, if the measure of carbon emissions is made exclusively at the tailpipe, and if this tailpipe measurement of carbon by regulation defines the rate

- 88 -

or quantity of fuel consumption, fuel economy, and greenhouse gas emissions, then 100% plant oil fuel running in a properly equipped diesel engine is less fuel efficient and produces worse fuel economy and more greenhouse gas emissions than petroleum diesel, even though the net life-cycle carbon emissions of the fuel, as measured from the point of extraction / cultivation of the fuel feedstock to its processing and distribution to the customer, are far lower and more environmentally favorable for 100% plant oil fuel.

9.    Concrete evidence of the disjunct between tailpipe carbon emissions versus life-cycle emissions with regards to 100% plant oil fuel can be found in the administrative record of this proceeding.  The results of POP Diesel's first set of emissions testing, submitted to EPA and DOT as an exhibit to POP Diesel's petition for reconsideration and amended and supplemental petition for reconsideration, testify to this disjunct.  Both the Draft Final Report and the Final Report of this emissions testing, conducted at West Virginia University's Center for Alternative Fuels, Engines and Emissions, contain this evidence.  See POP Diesel' Supplemental Appendix and Addendum, Volume 2 (Under Seal), at 275-311 (Draft Final Report) and 365-410 (Final Report).  In the Draft Final Report, the comparison of carbon dioxide ($CO_2$) readings from baseline testing on petroleum diesel, appearing on page 294 of POP Diesel's Supplemental Appendix and Addendum, Volume 2, are significantly lower than the $CO_2$ results for the

same engine with POP Diesel's Fuel System activated and running on 100%

vegetable oil fuel (which was 100% jatropha oil), appearing on the very next page,

page 295, for each and every of the six engine modes of operation (engine speed

and torque settings) tested.  In the Final Report, the same conclusion held, with the

exception of engine mode 1 of 6, as is evidenced by comparing modal results for

Carbon Balance Fuel Consumption, as measured by tailpipe emissions of both

carbon dioxide and carbon monoxide, between baseline readings on petroleum

diesel (pages 383-84) and readings with the POP Diesel Fuel System activated and

running on 100% vegetable oil (jatropha plant oil) (pages 384-86), and as depicted

in the bar graph appearing on page 393 of POP Diesel's Supplemental Appendix

and Addendum, Volume 2.  The overall conclusion, appearing in Table 22 on page

395, was that across five modes of engine operation, as measured by the Tailpipe

Rule, fuel consumption of 100% plant oil was a total of around 18% more than of

petroleum diesel for the engine to be able to perform the same amount of work.

(Please note that both the Draft Final Report and the Final Report are part of both

EPA's and the U.S. Department of Transportation's administrative records in Case

No. 12-1427 and DOT does not dispute that the Final Report is part of its

administrative record in this Case.).

10.    Thus, a snapshot of tailpipe carbon emissions falsely portrays POP

Diesel's 100% plant oil fuel as having a worse impact on carbon emissions to the

atmosphere than petroleum diesel, whereas if the measure were net life-cycle emissions, the reverse truth would be apparent.  Therefore, by relying on tailpipe emissions as the measure of greenhouse gas emissions, the Truck Rule actually penalizes POP Diesel's greenhouse gas-mitigating products.  Engine manufacturers will not only not receive any benefit from putting POP Diesel's 100% plant oil enabling equipment onto their engines, they will suffer a penalty, owing to the higher tailpipe emissions of carbon and consequent higher measure of fuel consumption, higher greenhouse gas emissions, and lower fuel efficiency under the Truck Rule's Fuel Efficiency Standards and Greenhouse Gas Emissions Standards, as compared with baseline petroleum diesel fuel.  As set forth in the Argument section of POP Diesel's Brief, alternative means of measuring fuel efficiency and greenhouse gas emissions that do not hinge exclusively on tailpipe emissions of carbon would not wrongly and arbitrarily penalize POP Diesel's products in the same way.

11.    I believe that EPA's program staff, the ones who develop policies and apply the Clean Air Act to POP Diesel and its products, understand and are aware of the issues described above, in the first part of this declaration.  Apparently, there was mis-communication, or a lack of communication, between them and EPA's lawyers about these facts, which led the lawyers to raise a question as to POP Diesel's standing to prosecute its petitions for judicial review of the Truck

Rule.  If the lawyers had asked for or received the full information about the Clean Air Act's applicability to POP Diesel, then perhaps (and I do not mean to be presumptuous in saying this) they would not have raised the same questions about POP Diesel's status as a regulated entity under the Clean Air Act and standing to prosecute the petitions for review.  I did not present the facts in this declaration earlier because I did not think that the government's lawyers would be uninformed about the factual matters underlying their arguments concerning standing.

12.    Although POP Diesel has worked with all different kinds and sizes of diesel engines, the big market for these engines and the fuels that run through them in the United States is the medium- and heavy-duty market; semi trucks consume the biggest share of petroleum diesel in the U.S. market.  Presently, almost all medium- and heavy-duty engines in the United States are compression ignition (diesel) engines that run on petroleum diesel fuel and are capable of running on POP Diesel's100% jatropha plant oil fuel.  POP Diesel's enabling engine equipment and 100% plant oil fuel can operate cleanly and safely in any such engine that POP Diesel equips. POP Diesel's initial approval from EPA and the National Highway Transportation Safety Administration was on a set of light-medium duty Ford F-250 and F-350 pick-up trucks with International 6.4 liter diesel engines in them from the 2008 and 2009 model years.  These engines and trucks were equipped with almost all of the latest emissions after-treatment

equipment on them, the exception being selective catalytic reduction, which

entails post-combustion injection of urea to reduce nitrous oxide emissions that

the combustion of 100% jatropha plant oil fuel will not interfere with.  Official

approval on these engines and trucks indicates that POP Diesel has figured out

how to, and is fully capable of, passing emissions testing and securing similar

approval on any of the latest medium- and heavy-duty diesel engines running on

100% jatropha plant oil as the diesel engine fuel.

13.    Although POP Diesel cut its teeth retrofitting more than thirty

different kinds of diesel engines and running them on 100% vegetable oil fuel, the

cost of POP Diesel's current retrofit kit, the one that satisfies emissions

requirements under the federal Clean Air Act, is $10,000 per unit.  Although POP

Diesel can offer customers whose engines POP Diesel has retrofitted modest real

savings on their diesel engine fuel bills, this price of the retrofit enabling

equipment is too high to attract many customers and for the Company to grow and

prosper.  Therefore, POP Diesel's future, and the future of its products beneficial

to combating global warming, lies in partnering with existing diesel engine

manufacturers and having them install POP Diesel's patented enabling equipment

onto their diesel engines from the factory to sell new, ready to run on POP

Diesel's 100% jatropha plant oil fuel.  As part of POP Diesel's dialogue with

several major diesel engine manufacturers, POP Diesel has estimated that the cost

to have its patented enabling equipment installed onto a semi truck engine at the factory would be between $1,500 and $3,000, depending on the engine.

14.    From many interactions going back as far as to 2008, it has been my and POP Diesel's experience and conclusion that existing diesel engine manufacturers, bigger investors, and big lenders do not want to partner with or assist POP Diesel unless and until federal greenhouse gas policy confers on POP Diesel's engine enabling equipment and 100% jatropha plant oil fuel tradable credits and other benefits that this policy accords to other alternatives to petroleum diesel engines and fuel.  Since POP Diesel's engine equipment and 100% jatropha plant oil fuel do not presently receive any of these credits or benefits, POP Diesel is at a standstill in forming such partnerships, receiving the necessary financing to complete its product development onto big, new diesel engines, and expanding the Company's toe-hold in the market.  POP Diesel's business model is predicated on the facts that its products confer a greater benefit in terms of greenhouse gas mitigation, and at lower cost, than competing biofuels, petroleum diesel, and alternative fuels and technologies.  However, if the governmental award of fuel consumption and greenhouse gas credits and other benefits illogically favors the alternatives over POP Diesel's engine technology and fuel, then POP Diesel's products will have a difficult time reaching the market, due to their non-acceptance by major engine manufacturers and investment financiers, and the

public will not have the benefit of POP Diesel's products to ensure better overall compliance with the climate control goal of the Clean Air Act, as directed by the Supreme Court in Massachusetts v. EPA.

15.    When I made the statement in 2011 in POP Diesel's petition for reconsideration to EPA and DOT that POP Diesel expected to introduce a new heavy duty engine to the market by mid-2014 equipped and ready to run on 100% plant oil as the diesel engine fuel, I was not anticipating the reluctance that the engine industry has exhibited to cooperating and partnering with POP Diesel to integrate the Company's patented auxiliary fuel system at the factory into their diesel engines.  POP Diesel would be happy to develop its own heavy duty diesel engines or to buy new heavy duty engines and equip them at a factory that POP Diesel would build, but POP Diesel would have to do this product development and manufacturing on a large scale, with thousands of engines, to make economic sense.  This cost is presently prohibitive for a small company, such as POP Diesel. Therefore, for the moment, POP Diesel's further penetration of the heavy duty engine market is dependent on its receiving a welcome invitation from one or more existing heavy duty engine manufacturers, which seems to depend in large part on inclusion of POP Diesel's products in and a blessing by federal greenhouse gas policy, contrary to the present state of exclusion and penalty.

16.    Once POP Diesel establishes such a partnership with an existing heavy

duty engine manufacturer, POP Diesel's engine product will be in a position

achieve a mass introduction to the market and will no longer fall under the

category of a small business under the Truck Rule regulations. (Please note that

while POP Diesel's present scale is considered small under these regulations, this

fact does not exempt POP Diesel from fully complying with the Fuel Efficiency

and GHG Emissions Standards for every model year engine subject to them on

which POP Diesel proposes to install its equipment on, as set forth above. The

classification of small scale only exempts POP Diesel from having to achieve the

fuel efficiency and GHG emissions benchmarks set forth in the Truck Rule across

any fleets of new engines that POP Diesel introduces to the market.). POP Diesel

has demonstrated in separate submissions that are part of the administrative record

of this proceeding that the worldwide potential to cultivate jatropha trees and press

the oil from their fruit seeds to make 100% jatropha oil fuel is enormous; this fuel,

run through POP Diesel-equipped engines, could displace a significant portion of

the petroleum diesel consumed in the United States and around the world.

Introduction of a new POP Diesel-equipped engine from a heavy duty engine

manufacturer's factory to the market can happen quickly, certainly within a year or

two.

17.    Therefore, POP Diesel's injury from the Truck Rule is presently

impending due to (a) the Tailpipe Rule's perverse penalizing of 100% plant oil

fuel operating in POP Diesel-enabled engines and (b) POP Diesel's lack of

partnership with a full-fledged diesel engine manufacturer to introduce POP

Diesel's products more broadly to the market, which is due in large part to the

Truck Rule's excluding POP Diesel's products from any credits or benefits, and

even penalizing them via the Tailpipe Rule.  The Tailpipe Rule causes POP Diesel

harm of a particular kind, and POP Diesel's harm illustrates the fallacy of the

Truck Rule's strategy for improving fuel efficiency and mitigating trucks'

greenhouse gas emissions by measuring them exclusively at the tailpipe.

Eliminating the Tailpipe Rule in favor of (a) counting only fossil fuel as "fuel" and

(b) awarding credits according to net life cycle greenhouse gas emissions would

redress this harm to POP Diesel and fuel efficiency and climate control strategy.

Conferring affirmative benefits on POP Diesel's 100% plant oil engine and fuel

products, as the Truck Rule purports to confer on other engines that run efficiently

and produce low greenhouse gas emissions, would remove a major impediment

that is blocking POP Diesel's products from entering the market in a big way.

 Further your declarant sayeth naught.

  _/s/ *Claude D. Convisser*_   July 22, 2014
Claude D. Convisser     Santa Fe, New Mexico

## Clean Air Act section 203(a)(1) and (a)(3), codified at 42 U.S.C. § 7522

(a) Enumerated prohibitions

The following acts and the causing thereof are prohibited—

(1) in the case of a manufacturer of new motor vehicles or new motor vehicle engines for distribution in commerce, the sale, or the offering for sale, or the introduction, or delivery for introduction, into commerce, or (in the case of any person, except as provided by regulation of the Administrator), the importation into the United States, of any new motor vehicle or new motor vehicle engine, manufactured after the effective date of regulations under this part which are applicable to such vehicle or engine unless such vehicle or engine is covered by a certificate of conformity issued (and in effect) under regulations prescribed under this part or part C in the case of clean-fuel vehicles (except as provided in subsection (b) of this section);

*   *   *

(3)

(A) for any person to remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter prior to its sale and delivery to the ultimate purchaser, or for any person knowingly to remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser; or

(B) for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use.

**Clean Air Act section 205, codified at 42 U.S.C. § 7524**

(a) Violations

Any person who violates sections  [1] 7522(a)(1), 7522(a)(4), or 7522(a)(5) of this title or any manufacturer or dealer who violates section 7522 (a)(3)(A) of this title shall be subject to a civil penalty of not more than $25,000. Any person other than a manufacturer or dealer who violates section 7522 (a)(3)(A) of this title or any person who violates section 7522 (a)(3)(B) of this title shall be subject to a civil penalty of not more than $2,500. Any such violation with respect to paragraph (1), (3)(A), or (4) of section 7522 (a) of this title shall constitute a separate offense with respect to each motor vehicle or motor vehicle engine. Any such violation with respect to section 7522 (a)(3)(B) of this title shall constitute a separate offense with respect to each part or component. Any person who violates section 7522 (a)(2) of this title shall be subject to a civil penalty of not more than $25,000 per day of violation.

(b) Civil actions

The Administrator may commence a civil action to assess and recover any civil penalty under subsection (a) of this section, section 7545 (d) of this title, or section 7547 (d) of this title. Any action under this subsection may be brought in the district court of the United States for the district in which the violation is alleged to have occurred or in which the defendant resides or has the Administrator's principal place of business, and the court shall have jurisdiction to assess a civil penalty. In determining the amount of any civil penalty to be assessed under this subsection, the court shall take into account the gravity of the violation, the economic benefit or savings (if any) resulting from the violation, the size of the violator's business, the violator's history of compliance with this subchapter, action taken to remedy the violation, the effect of the penalty on the violator's ability to continue in business, and such other matters as justice may require. In any such action, subpoenas for witnesses who are required to attend a district court in any district may run into any other district.

(c) Administrative assessment of certain penalties

(1) Administrative penalty authority
In lieu of commencing a civil action under subsection (b) of this section, the Administrator may assess any civil penalty prescribed in subsection (a) of this

section, section 7545 (d) of this title, or section 7547 (d) of this title, except that the maximum amount of penalty sought against each violator in a penalty assessment proceeding shall not exceed $200,000, unless the Administrator and the Attorney General jointly determine that a matter involving a larger penalty amount is appropriate for administrative penalty assessment. Any such determination by the Administrator and the Attorney General shall not be subject to judicial review. Assessment of a civil penalty under this subsection shall be by an order made on the record after opportunity for a hearing in accordance with sections 554 and 556 of title 5. The Administrator shall issue reasonable rules for discovery and other procedures for hearings under this paragraph. Before issuing such an order, the Administrator shall give written notice to the person to be assessed an administrative penalty of the Administrator's proposal to issue such order and provide such person an opportunity to request such a hearing on the order, within 30 days of the date the notice is received by such person. The Administrator may compromise, or remit, with or without conditions, any administrative penalty which may be imposed under this section.

(2) Determining amount
In determining the amount of any civil penalty assessed under this subsection, the Administrator shall take into account the gravity of the violation, the economic benefit or savings (if any) resulting from the violation, the size of the violator's business, the violator's history of compliance with this subchapter, action taken to remedy the violation, the effect of the penalty on the violator's ability to continue in business, and such other matters as justice may require.

(3) Effect of Administrator's action
(A) Action by the Administrator under this subsection shall not affect or limit the Administrator's authority to enforce any provision of this chapter; except that any violation,
(i) with respect to which the Administrator has commenced and is diligently prosecuting an action under this subsection, or
(ii) for which the Administrator has issued a final order not subject to further judicial review and the violator has paid a penalty assessment under this subsection,
shall not be the subject of civil penalty action under subsection (b) of this section.
(B) No action by the Administrator under this subsection shall affect any person's obligation to comply with any section of this chapter.

(4) Finality of order

An order issued under this subsection shall become final 30 days after its issuance unless a petition for judicial review is filed under paragraph (5).

(5) Judicial review

Any person against whom a civil penalty is assessed in accordance with this subsection may seek review of the assessment in the United States District Court for the District of Columbia, or for the district in which the violation is alleged to have occurred, in which such person resides, or where such person's principal place of business is located, within the 30-day period beginning on the date a civil penalty order is issued. Such person shall simultaneously send a copy of the filing by certified mail to the Administrator and the Attorney General. The Administrator shall file in the court a certified copy, or certified index, as appropriate, of the record on which the order was issued within 30 days. The court shall not set aside or remand any order issued in accordance with the requirements of this subsection unless there is not substantial evidence in the record, taken as a whole, to support the finding of a violation or unless the Administrator's assessment of the penalty constitutes an abuse of discretion, and the court shall not impose additional civil penalties unless the Administrator's assessment of the penalty constitutes an abuse of discretion. In any proceedings, the United States may seek to recover civil penalties assessed under this section.

(6) Collection

If any person fails to pay an assessment of a civil penalty imposed by the Administrator as provided in this subsection—

(A) after the order making the assessment has become final, or

(B) after a court in an action brought under paragraph (5) has entered a final judgment in favor of the Administrator,

the Administrator shall request the Attorney General to bring a civil action in an appropriate district court to recover the amount assessed (plus interest at rates established pursuant to section 6621 (a)(2) of title 26 from the date of the final order or the date of the final judgment, as the case may be). In such an action, the validity, amount, and appropriateness of the penalty shall not be subject to review. Any person who fails to pay on a timely basis the amount of an assessment of a civil penalty as described in the first sentence of this paragraph shall be required to pay, in addition to that amount and interest, the United States' enforcement expenses, including attorneys fees and costs for collection proceedings, and a quarterly nonpayment penalty for each quarter during which such failure to pay persists. The nonpayment penalty shall be in an amount equal to 10 percent of the aggregate amount of that person's penalties and nonpayment penalties which are

unpaid as of the beginning of such quarter.